[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 122 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 124 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 125 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 126 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 127 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 128 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 129 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 130 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 131 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 132 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 133 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 134 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 135 
The substitution of new and original phraseology in our statute defining the crime of murder (2 R.S., 651, § 5) was the result of an effort to clear the subject of the obscurity which grew out of the inaccurate use of some of the terms of the common law. To render this effort successful, it is necessary to construe the new terms used according to their plain and natural import. A resort to the rejected terms, in order to interpret those newly adopted, would obviously reinvest the subject with much of the previous uncertainty, and render abortive this attempt at elucidation.
When, therefore, it is said, as has been said by several of our judges, that the first subdivision of § 5 of our statute was intended to define murder from express, and the second and third from implied malice, no light whatever is thrown upon the true interpetration of the section.
A glance at the law of murder, as it existed prior to the Revised Statutes, will make it evident that the terms express and implied malice, and malice aforethought, used so copiously in every definition of murder at common law, must have been intentionally excluded from the statute; and I think it equally clear, in view of the great looseness and inaccuracy with which these terms had been used, that this exclusion was wise. There is no difference in the *Page 137 
nature or degree of the malice intended, whether it be called express or implied, when these terms are used in their most appropriate sense. If properly applied, they refer only to the evidence by which the existence of malice is established. Both alike, the one no less than the other, mean actual malice, malice shown by the proof to have really existed. It is called implied malice when it is inferred from the naked fact of the homicide, and express when established by other evidence. That this is the true original meaning of these terms, when used in connection with this crime, is apparent, I think, from the natural import of the words themselves, as well as from their accustomed use in other branches of the law. They are appropriate terms to express different modes of proof, and are habitually used for that purpose, but are not adapted to the description of different degrees of malicious intent. The phrase, implied malice, is properly applied to a case where the evidence shows that the accused did the act which caused the death, but where there is no other proof going to show the existence or the want of malice. In such cases the law does not impute a malicious intent, irrespective of its real existence, but it presumes, in accordance with the settled rules of evidence, that such an intent did actually exist.
York's case (9 Metc., 93) was a case of this description, and the rule as well as the reason upon which it rests are there stated by Chief Justice SHAW. In speaking of the mere act of destroying life, he says: "The natural and necessary conclusion and inference from such an act wilfully done, without apparent excuse, are that it was done malo animo, in pursuance of a wrongful, injurious purpose, previously though perhaps suddenly formed, and is therefore a homicide with malice aforethought, which is the true definition of murder. And it appears to us that this is not a forced, arbitrary, technical or artificialpresumption of law, but a natural and necessary inference from the fact." Again he says: "A sane man, a voluntary agent, acting upon *Page 138 
motives, must be presumed to contemplate and intend the necessary, natural and probable consequence of his own act."
This case and this reasoning afford a clear illustration of what is properly meant by the term implied malice. But the same term has also been frequently, but as I maintain inappropriately used, to express a different meaning. It has been extensively applied to cases of constructive murder, that is, to those cases where, although the want of any actual intent to take life is conceded, yet the law, in view of some other malicious or criminal intent, punishes the offence as murder; and to cases of death produced through an utter wantonness and recklessness as to life in general, as well as to cases where the life of an officer is unintentionally taken when engaged in the performance of his duty. (15 Viner's Abr., title "Murder," E; Rex v. Oneby, 2Ld. Raym., 1488; People v. Enoch, 13 Wend., 159, per
NELSON, J.)
Now, what is meant by this application of the term impliedmalice, indiscriminately to all cases arising under either of these several cases? It is apparent that, so far as any actual criminal intent exists, it may be expressly proved in these cases as well as any others. It follows, therefore, that in cases where such proof is given, implied malice, if it means anything, must mean malice which has no existence in fact, but which the lawimputes to the guilty party. This implication of a species of malice which did not exist seems to have been invented for the purpose of bringing cases of constructive murder, so called, within what was supposed to be the legal definition of the crime. It was evidently supposed that the word malice meant in all cases ill will towards some person or persons, and hence that the phrase, malice aforethought, used in indictments for murder, necessarily imputed a charge of premeditated design to kill. To meet this averment, which in cases of constructive murder was not required to be proved, the law was said to imply, that is, to supply by mere fiction, the requisite degree of malice. There was, however, in truth not the slightest necessity for *Page 139 
this fiction; the interpretation of the word malice on which it was founded being entirely erroneous. The idea that the term malice necessarily imports ill will towards another, when used in a legal sense, is abundantly refuted by Mr. Justice BAYLEY, in the case of Bromage v. Prosser (4 Barn. Cress., 255). He says: "Malice, in common acceptation, means ill will against a person, but in its legal sense it means a wrongful act done intentionally, without just cause or excuse. If I give a perfect stranger a blow likely to produce death, I do it of malice, because I do it intentionally and without just cause or excuse. If I maim cattle without knowing whose they are, if I poison a fishery without knowing the owner, I do it of malice, because it is a wrongful act and done intentionally. If I am arraigned of felony, and wilfully stand mute, I am said to do it of malice, because it is intentional and without just cause or excuse."
This passage is cited and approved by Chief Justice SHAW, inYork's case (9 Metc., 93), and there are many other authorities to the same effect. To show that the view here presented is in entire accordance with the ancient law, I will quote a passage or two from Foster, one of the earliest and clearest writers on criminal law. (Foster's Cr. L., 256, 7.) He says: "When the law maketh use of the term malice aforethought,
as descriptive of the crime of murder, it is not to be understood in that narrow, restrained sense to which the modern use of the word malice is apt to lead one, a principle of malevolence to particulars; for the law by the term malice in this instance meaneth that the fact hath been attended with such circumstances as are the ordinary symptoms of a wicked, depraved, malignant spirit." Again he says: "And I believe that most, if not all the cases which in the books are ranged under the head of impliedmalice, will, if carefully adverted to, be found to turn upon this single point, that the fact hath been attended with such circumstances as carry in them a plain indication of a heart regardless of social duty, and fatally bent on mischief." *Page 140 
This is the precise doctrine for which I contend. It shows that the resort to a fictitious imputation of a species of malice, having no existence in fact, called implied malice, was gratuitous and unnecessary; and being so, it could scarcely fail to be pernicious. It tended to introduce confusion, through the indiscriminate use of the word implied in two conflicting senses; one importing an inference of actual malice from facts proved, the other an imputation of fictitious malice without proof.
In putting a construction, therefore, upon our statute, we should lay aside entirely the common law terms of express and implied malice, as calculated to mislead and to engender false ideas, and interpret the phraseology, as before insisted, according to its ordinary import. Looking then at the statute itself and construing it in this spirit, what is its real scope and meaning?
In endeavoring to answer this inquiry it is important to keep in view certain rules which reason and experience have established as calculated to aid in the just interpretation of statutes.
If the enactment be subdivided, each subdivision should be construed so as to provide for a separate and distinct class of cases, and so as to include all the cases it is intended to embrace and to exclude all others. Each clause is also to be construed in the light of all the rest, and so as to give force and effect to every sentence and word; and such a construction is to be put upon the whole, if possible, that no case or class of cases will fall within more than one branch of the act.
These rules are necessary in order to attain that precision and certainty which is the object of the subdivision.
There is, I believe, no great contrariety of opinion as to the meaning of the first subdivision of § 5 of the statute in question. If there is any difficulty in this respect, it is in ascertaining whether the last clause of that subdivision, viz., "or of any human being," was intended to provide solely for *Page 141 
cases where the premeditated design, although not aimed at the person actually killed, was nevertheless directed to some particular individual; or whether it also includes cases where it was aimed indiscriminately at a multitude of persons or at human life in general.
That the former is the true interpretation was insisted by the prisoner's counsel, upon the argument, for several reasons. He urged, first, that on comparison of § 5 of our statute with the description of murder from malice aforethought express, as given in East's P.C., 223, § 10, and considering that the revisors, in their note to § 5, expressly say that it was compiled partly from East, it is apparent that the first two subdivisions of § 5 were copied substantially from the definition given by East; the only material difference being that the first two subdivisions of East are in our statute condensed into one, and that as both subdivisions in East are plainly and expressly confined to cases of malice to a particular individual, the corresponding subdivision in our statute should receive the same construction. Again, he contended that, as the first clause of this subdivision was clearly confined to cases of particular malice, the last being directly connected with it should be held to belong to the same class, agreeably to the maxim noscitur asociis. (Broom's Leg. Max., 294; Evans v. Stevans, 4 TermR., 225.)
I have very little hesitation in adopting the construction of this subdivision thus contended for, not only for the reasons given by the counsel, but for others which will appear when we take into consideration the second subdivision.
This brings us to the difficult part of our task; that of interpreting the second subdivision of the section in question. This subdivision was incidentally and partially considered inThe People v. Rector (19 Wend., 569) and in The People v.White (24 Wend., 520). But the examination given to it in those cases was cursory merely, and no attempt was made *Page 142 
to subject it to that rigid analysis which is indispensable to the development of its true meaning.
It becomes necessary, therefore, in my view, to look at the subject as an original question. In doing so I shall inquire, first, whether an actual intent to destroy life is in all cases essential to constitute the crime of murder, under this subdivision. The affirmative of this question was very strenuously contended for by the counsel for the prisoner, upon the argument, and great learning and ability were displayed in the effort to maintain it. He contended that there was a substantial identity of design and object between our statute and that of Pennsylvania, passed in 1794; and that as the latter statute had been construed to limit murder as a capital crime, except in a few specified cases of constructive murder, to those cases in which an actual intent to take life exists, ours should receive the same construction; and insisted that the first subdivision of § 5 being intended to provide for all cases where the hostile intent was specially aimed at the life of some one individual, the second subdivision was designed to embrace only those cases excluded from the first, where the intent, although deadly, does not single out its object.
But there are serious objections to taking this view of the latter subdivision, conceding the construction thus put upon the first to be, as I think it is, correct. Of what use, upon this supposition, are the words "imminently dangerous to others?" Are they not rendered mere unmeaning verbiage by assuming that an actual intent to take life is essential to the crime under this subdivision? Again, if such an intent is necessary, the requirement must be found in the definition of the crime given by the statute. The only affirmative words indicative of the intent required are these: "a depraved mind, regardless of human life." These words describe the state of mind which must accompany the act. Do they express a formed intent to destroy life? Clearly not. No sound reason can be given why the legislature should have resorted to such equivocal and circuitous *Page 143 
phraseology to express that simple intent. Such an intent is expressed in clear terms in the subdivision which precedes as well as that which follows the one under review: would they not have expressed the same intent in the same way in this, if that was what was meant? Would they have resorted to phraseology not only peculiar, but such as does not import what, upon this supposition, they intended? It seems to me not.
But this is not all. The phraseology of the subdivision is taken substantially from the writers upon the common law. An absolute intent to take life was not necessary at common law to constitute the crime described by this phraseology. As to this there is no room for doubt. The first general division of homicide, as given by East, is as follows: "From malice aforethought express: where the deliberate purpose of the perpetrator was to deprive another of life, or to do him somegreat bodily harm." (1 East's P.C., 222, § 9.) This general division of homicide is again divided by East into three subdivisions in the next section, as follows: 1. From a particular malice to the person killed; 2. From a particular malice to one, which falls by mistake or accident on another; 3. From a general malice or depraved inclination to mischief, fall where it may. Now, as this third subdivision is obviously a specification of the nature of the cases falling within the last clause of the previous general division, it is entirely clear that it was intended to describe a class of cases in which a deadly intent is not required to make out the crime.
It has been already intimated that the first subdivision of § 5 of our statute appears to be a virtual transcript of the first two subdivisions just given from East. It is, I think, equally apparent that the second subdivision in our statute was taken substantially from the third subdivision of East, although not a literal transcript of it. The inference from this is very strong that it was intended to describe the same class of cases; and if so, then it follows from what has *Page 144 
already been said, that a deadly intent is not necessary to constitute the crime of murder under it.
But there is an important clause added to the second subdivision in our statute, which does not appear at all in East; and it becomes indispensable to ascertain its design and object. If we can discover the true object of introducing this clause, we have a key to the interpretation of the whole section. The words are: "although without any premeditated design to effect the death of any particular individual." These words must have been introduced for some purpose; what was it?
I remark first, that they were not designed to show that a particular deadly intent is not essential to constitute the crime, because they could not have been deemed at all necessary for that purpose. The idea of such a necessity seems, as we have already shown, to be excluded by the whole phraseology of the subdivision. No corresponding language is contained in East's definition of this class of murders. He evidently considered the definition complete and perfect without it. Besides, if this clause was introduced for that purpose, the plain implication would be that a general deadly intent, not aimed at any particular individual, is necessary. This would be repugnant to all our previous reasoning, and would exclude from the operation of the subdivision the very cases which at common law marked the class. This view of the clause would also effectually exclude the case at bar from the subdivision. But I consider it clear, from what has been heretofore said, that this could not have been the object of the clause.
There is but one other purpose which this clause could have been intended to subserve. Although the terms of the second subdivision do not require a deadly intent to make out the crime, yet, independent of the clause in question, they do not exclude it. Hence the second subdivision might be construed to embrace most if not all the cases provided for in the first. This would defeat the very object *Page 145 
of the classification, which was to draw a clear line of distinction between the different classes, and prevent confusion by their merger.
The plain object, therefore, of the last clause of the second subdivision, and the only conceivable object, I hold to have been to mark the distinction between that subdivision and the first, by at once excluding from the former all cases of particular,
and at the same time stateing that it was not intended to exclude cases of general deadly intent.
Assuming this to have been its object, it is apparent that force and significancy is given to every word of the clause in question; and that each of these subdivisions is made to stand out, isolated and distinct, with boundaries clearly marked, and with no tendency to fusion with each other.
It will be seen that this view necessarily limits the first subdivision to cases of particular malice, from the antithetical relation between that subdivision and the last clause of the second. This will be made more apparent by reading the two clauses in connection, omitting the intermediate significant words, thus: "when perpetrated from a premeditated design to effect the death of the person killed, or of any human being, or when perpetrated" [in a certain way], "although without any premeditated design to effect the death of any particular individual."
I doubt whether any other reading can be adopted, which will at once give scope and meaning to every word of both subdivisions, and at the same time accomplish the object of drawing a definite and clear line of demarcation between the two. We have then the precise classification of East; the only difference being, that in our statute it is simplified by reducing the first two subdivisions into one, and rendered a little more definite by theexpress exclusion from the last subdivision of all cases embraced in the first.
What then are the cases which, upon this construction, were intended to be included in the second subdivision? In considering this question, it is clearly proper in the first *Page 146 
place to inquire what kind of cases were embraced in the corresponding class as defined by East.
The words in East are: "From a general malice, or depraved inclination to mischief, fall where it may." The word "general" here used, and the last words of the sentence, leave no doubt as to the nature of the cases contemplated by this subdivision. They were cases of depraved and reckless conduct, aimed at no one in particular, but endangering indiscriminately the lives of many, and resulting in the death of one or more.
If this be not clear upon the words themselves, the comments of Mr. East upon this subdivision would seem to put the matter at rest. (1 East's P.C., 231, § 18.) In illustrating this subdivision, he says: "The act must be unlawful, attended with probable serious danger, and must be done with a mischievous intent to hurt people, in order to make the killing amount to murder in these cases;" and the instances he gives are as follows: "If a person breaking in an unruly horse wilfully ride among a crowd of persons, the probable danger being great and apparent, and death ensue from the viciousness of the animal, it is murder." Again, "So if a man, knowing that people are passing along the street, throw a stone likely to create danger, or shoot over the house or wall, with intent to do hurt topeople, and one is thereby slain, it is murder." These are the only examples given, and they accord perfectly with the language of the subdivision, and show that the latter was intended to embrace those cases of general malice only, where the lives ofmany were or might be in jeopardy. The inference is very strong that the subdivision of our statute which we are considering was intended to provide for the same cases as that of East, from which it was substantially taken. But the argument in favor of this construction is by no means confined to this inference.
It is clear, I think, from what has been already said, that the subdivision in question does embrace those cases where *Page 147 
an intent to take life exists, which is not directed to any particular individual, but is general and indiscriminate. The language of the subdivision, however, at the same time shows that it was not intended to be confined to those cases, but was designed to include another class, closely akin to and almost identical with those, in which death is produced by acts putting the lives of many in jeopardy, under circumstances evincing great depravity and utter recklessness in regard to human life. For instance, a man may fire into a crowd with the view of destroying life, and he may do so for the mere purpose of producing alarm, although at the imminent hazard, as he knows, of killing some one. Again, he may open the drawbridge of a railroad with intent to destroy the lives of the passengers, or he may do it for the sole purpose of effecting the destruction of the property of the railroad company. The subdivision in question was intended to provide for all these and similar cases indiscriminately, putting them upon the same footing, without regard to the particular intent. The phrases "imminently dangerous to others," and "depraved mind, regardless of human life," have an apt and intelligible meaning when used in regard to such cases.
If then the subdivision was intended to include cases of this description, it would seem to follow, upon the plainest principles of construction, that cases of death produced by acts affecting a single individual only are excluded. It would be repugnant to all sound rules of interpretation to associate under the same clause of a statute groups of cases so dissimilar as those, examples of which I have just given, and ordinary homicides; especially where, as in the present instance, an attempt has been made in framing the statute at a precise classification of the cases arising under it.
The examples which I have given as falling within the provision belong to a class having marked features easily distinguishable from all others; and there is no difficulty in so construing the subdivision in question as to exclude cases not *Page 148 
belonging to this class, and at the same time so as to include all cases falling properly within it. For these reasons I am entirely satisfied that this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of many persons in jeopardy without being aimed at any one in particular, and are perpetrated with a full consciousness of the probable consequences. Such acts may well be said to evince that reckless disregard of and indifference to human life, which is fully equivalent to a direct design to destroy it. The moral sense of mankind distinguishes between acts of this sweeping and widely dangerous character and ordinary cases of individual homicide, and so in my judgment does the statute.
But there is an additional reason for putting this construction upon the subdivision in question. If it can be so construed as to include the case at bar, and others of a similar description, we are left wholly without any line of distinction between murder and manslaughter, except the loose and uncertain opinion of a jury as to whether the act which produced death did or did not evince a "depraved mind, regardless of human life." There is scarcely a case of manslaughter which upon this construction may not be brought within the definition of murder, and punished as such, provided a jury can be found to say that the act which produced death evinced a "depraved mind, regardless of human life;" because the other clause, to wit, "imminently dangerous to others," if it can apply to this would apply to every case of homicide, as the result would always prove the imminently dangerous nature of the act; and because upon this construction cases of homicide committed unintentionally, in the heat of passion, would not be excluded, as such a case might very well evince a depraved mind, regardless of human life, in the opinion of a jury. This construction then would throw us upon that sea of uncertainty which it was the special object of the revisors in framing, and of the legislature in adopting the section in question, to avoid. *Page 149 
My conclusion therefore is, that the only construction which is consistent with the language of the section as a whole, with the object aimed at in its adoption, with the precision and certainty of the law, and with the convenient and safe administration of justice, is that which I have already given.
I omit to express any opinion as to the particular degree of manslaughter within which this case is embraced, it being unnecessary to the decision of the cause. The question was somewhat agitated upon the argument, but ought perhaps to be more fully discussed and more deliberately considered before it is definitively settled.
It follows from what has been said, hat the judge erred upon the trial in submitting the case to the jury under the second subdivision of the section of the statute in question, and consequently that there must be a new trial.