Hogan vs. The State.

## HOGAN vs. THE STATE.

BILL OF EXCEPTIONS. (1, 2) *Form and contents.* (2, 3) *Its authority when it contradicts the record proper.*

NEW TRIAL IN CRIMINAL ACTION. (4-6) *Motion therefor must be before judgment.* (5) *In the court where the record is.* (6, 7) *What objections to juror a ground of new trial.*

REVERSAL OF JUDGMENT. 8)*When judgment not reversed for inaccuracy of instructions.*

CRIMINAL LAW: MURDER. (9-11) *Evidence of good character; its effect.* (10-20) *Murder in the first and second degrees. Statutory definitions. Rules of construction.*

1. A bill of exceptions should not be signed with a *blank.*

2. It is not the office of a bill of exceptions to set forth anything which ought otherwise to appear by the record, nor to correct or vary the record proper, but merely to put upon the record what would not otherwise appear upon it. And where such bill contains statements at variance with the record proper, it is of no authority.

3. The record proper in a criminal action shows that after motion for a new trial denied, judgment was entered on the verdict, and the accused sentenced, March 9th; and that on the 11th of March he filed a second motion for a new trial, with affidavits in support thereof; and it discloses no action taken by the court on such motion. The bill of exceptions states that such second motion was made *before* judgment and sentence. *Held,*

 (1.) That the record proper imports absolute verity, and shows that the second motion was made *after judgment.*

 (2.) That the presumption therefrom is, that the court below declined to entertain such motion.

4. At common law, motions for a new trial must be made *before judgment;* and there is nothing in our statutes changing the law in that respect, even in criminal cases.

Hogan vs. The State.

5. Secs. 6 and 7, ch. 180, R. S., provide for the allowance of a new trial, after verdict of guilty in a criminal action, where the cause is removed, before judgment, to this court, on exceptions; and this motion must be made *in the court where the record is* (whether this court or the trial court), and must still be made before judgment.

6. In this case a motion for a new trial, made after judgment, on the ground that one of the jurors by whom the verdict was rendered had not resided for a year in this state, and that this fact was not known to the accused or his counsel until after verdict, was *too late*, and was properly disregarded by the court.

7. Whether the objection taken to the juror would have been good ground for a challenge; or whether, being so, it would have been good ground for a new trial, if a motion therefor had been made in time; or whether, being so, it could have prevailed, on the affidavits made, on a *second* motion for a new trial before judgment — are questions not here decided.

8. Mere defectiveness or inaccuracy of the charge is not sufficient ground of reversal, unless the charge misstated the rule of law in some substantial way, calculated to mislead the jury on the questions submitted to it.

9. In an indictment for murder, where the homicide was not denied, justified or excused, but the only question was the *degree* of guilt, the accused gave uncontradicted evidence of *good character*. No special instructions as to the effect of such evidence being asked, the court charged that the evidence was competent, but could not avail against facts positively proven; that the effect of such evidence is, that in cases of merely circumstantial evidence, where the evidence is nearly balanced, it might be sufficient to acquit; and that such evidence is of little or no avail in cases of higher crimes. The jury found that defendant killed the deceased, without design to kill him, by an imminently dangerous act, evincing a depraved mind, regardless of human life. *Held*, that while the charge may have been in some respects incomplete and inaccurate, defendant appears to have had all the advantage to which he was entitled from his evidence of good character; and there was no error for which the judgment should be reversed.

10. The homicide and its circumstances being fully proved, evidence of good character could go only to the *intent* of the accused. The qualities of the act as "imminently dangerous and evincing a depraved mind, regardless of human life," are, by the statute, to be found *in the act itself*, and the circumstances of its commission.

11. "Heat of passion," in such a case, is a fact to be *proved*, like any other, and not to be *presumed* from good character, in the absence of direct evidence.

12. The words "premeditated design to effect death," in the definitions of murder in the first and second degrees (R. S., ch. 164, sec. 2), signify merely an *intent to kill*, and do not exclude a *sudden intent*.

13. The *first degree* of murder, under our statute, requires *actual malice;* the other two degrees require only *constructive malice*, i. e., the malice which the law *implies* from the "imminently dangerous" or the felonious act in which the murderer was engaged.

14. Murder in the *first* degree, under our statute, includes cases of *general* malice, as well as cases of *particular* malice, where the other conditions of the crime are present; i. e., the *intent to kill*, which is an essential element of the crime, need not be an intent to kill *any particular person*.

15. Under R. S., ch. 5, sec. 1, subd. 2, the court, in construing a statute of this state, is bound to interpret plural words as including the singular, if necessary to the true construction and application of the statute.

16. In the statutory definition of murder in the *second* degree, the words "any act imminently dangerous *to others*" must be held to mean, any act imminently dangerous to *any person or persons other than the one committing it*.

17. Where there is an apparent incongruity between the terms used in defining the *positive* qualities of a crime, and negative terms used in defining a quality excluded therefrom as belonging to a higher grade of crime, the former must control.

18. All the positive terms used in our statute to define the crime of murder in the *second* degree, include cases of *particular* constructive malice, as well as cases of *general* constructive malice.

19. There is nothing in the negative terms, "although without any premeditated design to effect the death of *any particular individual*," which should exclude from the definition of murder in the second degree cases of *constructive* malice against a *particular individual;* but the definition should be construed in the same manner as if the words were, "although without premeditated design to effect the death *of any person*." ·

20. Under circumstances involving no danger to any third person, defendant struck the deceased on the forehead and face with the sharp edge of an axe, inflicting wounds which caused death. There was no proof that the act was done in the heat of passion. The court instructed the jury, in substance, that if they did not find that defendant intended to kill the deceased, but found that the act which caused death was one imminently dangerous to him, evincing a depraved mind on the part of defendant, regardless of human life, they might find him guilty of murder in the *second* degree. *Held*, no error.

ERROR to the Circuit Court for *Manitowoc* County.

The plaintiff in error, having been convicted of murder in the second degree, seeks here to reverse the judgment. The case will sufficiently appear from the opinion.

*Taylor & Sutherland*, for plaintiff in error, contended that the court erred in its instruction to the jury as to the effect of the evidence of good character. While there was no dispute as to the facts of the killing, and the only issue was, whether the crime was murder or manslaughter in one of the degrees, the former character of the prisoner ought to have considerable weight in determining this point. The questions were, Was the blow struck deliberately, with a premeditated design to kill the deceased? Or in the heat of passion, without such design? Or not in the heat of passion, with a design to do bodily harm short of death? Upon an issue of that kind, the former character of the defendant ought to have much weight. If his character had been bad, evidencing a wicked and malicious disposition, there would certainly have been more reason for attributing a malicious and wicked design to the act here in question, than if he had always been of good character and kind disposition. Wharton's Am. Crim. Law, §§ 636, 643, 824. 2. The evidence clearly established the fact that the fatal blow was directed solely against the deceased. The act was either murder in the first degree or manslaughter. *Darry v. The People*, 10 N. Y., 136–157; *Foster v. The People*, 50 id., 600. See also opinion of WAGER, Senator, 24 Wend., 583 ; *Rowan v. The State*, 30 Wis., 129; *State v. Hammond*, 35 id., 315. 3. A new trial should have been granted because one of the jurors was not an elector of the state (Tay. Stats., 1327, § 1), and the fact was not known to defendant until after the verdict. In trials for murder, defendant waives nothing by mere silence, or by any laches of himself or counsel. Some of the cases go so far as to hold that he is not bound by an actual waiver in open court of any right which the law secures to him. *People v. Cancemi*, 7 Abb. Pr., 271, 312; *Keenan v.*

*The State*, 8 Wis., 132; *Schumacher v. The State*, 5 id., 324; *Rowan v. The State*, 30 id., 143. In this state, at least, such a want of qualification on the part of a juror in the trial of a charge of murder, if not known to defendant until after verdict, is good ground for setting the verdict aside. *State v Cole*, 17 Wis., 674; *State v. Vogel*, 22 id., 471; *Schumacher v. The State*, and *Keenan v. The State, supra*.

*The Attorney General*, for the state, contended that the motion for a new trial on the ground that one of the jurors was not an elector of the state, was properly denied. The statute (Tay. Stats., 1327, § 1) which provides that "all persons who are citizens of the United States and qualified electors of this state, shall be *liable to · be drawn* as jurors, except" etc., does not in terms, or by fair implication, declare that none but citizens and qualified electors are competent to serve as jurors. At common law, *alienage* was ground of challenge; but the weight of authority is, that after verdict it could not be taken advantage of. Suffrage not existing at common law, not being an elector was not ground of challenge; and there is no reason why it should have been, if suffrage had existed. It does not affect the intelligence or the impartiality of the elector. An alien, on the other hand, would be presumed to know little of the language, laws, institutions or modes of procedure of the country. If a mere nonelector is incompetent, it must be solely because he is so declared by statute. It is submitted that the cases in this state, collected in 17 Wis., 674, are not decisive of this question. See 12 Wis., 519; *State v. Vogel*, 22 id., 471. In the case of a *grand* jury, there is no opportunity for defendant to object; hence he waives nothing. But in the case of a petit jury, defendant should be held to waive any objection not made before the juror is sworn. *Comm. v. Gee*, 6 Cush., 178; *Shoemaker v. The State*, 12 Ohio, 52; *Gillespie v. The State*, 8 Yerg., 507; *Hollingsworth v. Duane*, 4 Dallas, 353; *State v. Fisher*, 2 Nott & Mc., 261; *State v. Quarrel*, 2 Bay, 150; *Greenup v. Stoker*, 3 Gilm., 202; *Presbury v. Comm.*, 9

Hogan vs. The State.

Dana, 203; *Quinebaug Bank v. Leavens*, 20 Conn., 89; *King v. Sutton*, 8 Barn. & Cress., 417; *Williams v. The State*, 37 Miss., 407. 2. There was no error in the instruction that the jury might find the defendant guilty of murder in the *second* degree. Tay. Stats., 1826, § 2; *Rowan v. The State*, 30 Wis., 129, 141.

RYAN, C. J. The plaintiff in error was indicted for murder. On a former trial, the jury found him guilty generally, without specifying the degree of murder. On that ground, the judgment was reversed. *Hogan v. State*, 30 Wis., 428.

On his second trial, he was found guilty of murder in the second degree, and sentenced to the penitentiary for life. From that conviction he prosecutes the present writ of error.

His case was very ably presented by his counsel, who presented three grounds for reversal of the judgment.

I. It appears by the record that the verdict was rendered March 7, 1874. On the same day, the plaintiff in error made, and the court below made an order overruling, a written motion for a new trial, on the grounds that the court below misdirected the jury, that the verdict was not supported by evidence, and that it was against law and evidence. March 9, judgment was entered on the verdict, the plaintiff in error sentenced, and a certificate thereof delivered to the sheriff. March 11, the plaintiff in error filed another written motion for a new trial, on the ground that one of the jurors had not resided in the state for a year, supported by the juror's affidavit of the fact, and his own affidavit that he and his counsel did not know the fact until after the verdict; both affidavits made on the same day. The record discloses no action taken or order made by the court below on this second motion.

It is true that the bill of exceptions states that the second motion was made on the (*blank*) day of March before judgment and sentence, and that it was denied by the court; and that afterwards, on the (*blank*) day of March, judgment was rendered. A bill of exceptions should never be signed with a blank.

But to give full force to the words used, without dates, they work a direct contradiction between the bill of exceptions and the record proper. Were these of equal authority on the point, we might be obliged to send the record down for correction. This is the second case of conflict between the record proper and the bill of exceptions which we have found at this term. We cannot but deplore such misprision where the law implies absolute verity. But, in this instance, we must be guided by the record proper. It is not the office of a bill of exceptions to set forth anything which ought otherwise to appear by the record. The office of a bill of exceptions is to put upon record what would not otherwise appear upon it; not to correct it or vary it. So far, and so far only, for that purpose, and for that purpose only, a bill of exceptions becomes itself a part of the record. Any repetition of the record proper, any statement of what ought to appear by the record proper, any qualification of the record proper, is *ultra vires* in a bill of exceptions. In this case the record not only imports absolute verity, but the bill of exceptions suggests an impossibility. It asserts that the court below heard and overruled before judgment, a motion which was not made for two days after judgment. Such a suggestion cannot mislead us from giving to the record the credence due to it by law. The presumption from the record is, that the court below declined to entertain the second motion. And if that be the fact, the court below was right in it.

It is certain that, at common law, motions for new trial must be made after verdict and before judgment. It would be no greater absurdity to move for a new trial, at common law, before verdict, than after judgment. And our only doubt on this point was suggested by sec. 6, ch. 180, R. S. This provides that the circuit court at the term of trial, and the circuit or supreme courts within a year after, may grant new trials to defendants in criminal cases, for proper cause.

In cases of conviction for crime, judgment with us usually

follows verdict far within a year.   And, at common law, a new trial could be granted on the motion of the party, only in the court in which the trial had taken place.   And, though the statute has no express words tending that way, it struck us at first sight that the extension of time for making motions for new trial, and the power given to this court to grant such motions in cases tried at the circuit, might imply an intention to provide for such motions after judgment, for a review of the facts perhaps, in the nature somewhat of a writ of error *coram nobis*. And though this was not suggested by the learned counsel for the plaintiff in error, we thought that this might be the ground on which he rested his second motion.   And we were induced to examine the section carefully.

We find that the section was adopted in the revision of 1839, was continued in the revision of 1849, and still preserved in the revision of 1858.   We find that it was first taken, with slight verbal change, from Massachusetts, in which state it appears to have been adopted as early as 1832.   In Massachusetts, from that year down, it is immediately followed by another section providing for the review of criminal cases by the supreme court, on exceptions, after verdict of guilty and before judgment.   And we find our section immediately followed by a similar section in all the revisions of 1839, 1849 and 1858.

It appears to be a more common practice in Massachusetts than it has been with us, to review criminal cases in this manner.   And the interpretation of the provision, in that state, appears to be, that the motion must still be made between verdict and judgment; that it must be made in the court in which the record is; if exceptions have not been certified up to the appellate court, then in the court in which the case was tried; if exceptions are in the appellate court, then in that court. *Commonwealth v. Peck*, 1 Met., 428.   And that manifestly appears to be the true construction of the section.

We have, therefore, no choice but to hold that the plaintiff in-

error's second motion for a new trial, made after judgment, was too late. Whether the objection taken to the juror would have been good ground of challenge; or whether, being so, it would have been good ground for a new trial; or whether, being so, it could have prevailed on the affidavits made, on a second motion for a new trial before judgment—are questions we are not called upon to decide. With our views of the law already stated, we have little trouble in disregarding the objection to the juror. For, if well taken, it is purely technical. The fact that the juror had not resided in the state quite long enough to vote at an election on the day he was impaneled, might perhaps disqualify him to sit, but surely could not disqualify him to find a just verdict; might perhaps import ignorance of affairs essential to the elective franchise, but surely not a want of the intelligence and integrity essential to a juror. And it is apparent that, in being too late to make the objection to the juror, the plaintiff in error loses no substantial right.

II. On the trial below, the homicide was not denied, nor justified, nor excused. The only question was the degree of guilt of the plaintiff in error. He gave uncontradicted evidence of good character. He does not appear to have asked any specific instruction from the court below on the effect or bearing of such evidence. If the court below failed to give full instruction on the point, it was perhaps his duty to have asked for it. But we cannot reverse the judgment upon mere criticisms upon the charge, unless we find that it misstated the rule in some substantial way, calculated to mislead the jury on the questions submitted to them.

The learned judge who presided at the trial instructed the jury that the evidence was competent, but that it could not avail against facts positively proven. So far, the charge appears to us entirely correct. But he further told the jury that the effect of such evidence is, that, in cases of merely circumstantial evidence, where the evidence is nearly balanced, it might be sufficient to acquit a defendant. This is doubtless an

effect, but not the only effect of such evidence. Evidence of good character is admitted, in criminal cases, for the purpose of leading the jury to believe that the accused is not likely to have committed the crime. The jury was further told that such evidence is of little or no avail in cases of higher crime. But this followed what had been said of its not availing against positive proof, and, applied to the high crime charged and positively proven in this case, was not calculated to mislead the jury. We say high crime positively proved, because, whatever may have been the degree of guilt, the homicide was a high crime. Taken together, this was not a full nor a very accurate statement of the law. But it appears to have been all said as a comment on the argument of the plaintiff in error that his evidence of good character should have great weight in mitigating the degree of his crime. What weight it might have had, in that respect, we will presently consider. We cannot see how the jury could have been misled by any inaccuracies in the charge. The entire charge on the subject seems to have been taken from the charge in *Commonwealth v. Webster*, 5 Cush., 295; and has the sanction of as great a name as C. J. SHAW'S, with the apparent concurrence of WILDE, DEWEY and METCALF, JJ. And any inaccuracy in the language used seems not to have been regarded as error by bench or bar in Massachusetts, even in that *cause celebre*, for it is not adverted to in the application for a writ of error. *S. C.*, 5 Cush., 386.

Conceding some incompleteness and inaccuracy in what was said to the jury, it would be still a question how far it can be held for error. The homicide being admitted, in such a case, evidence of good character could go only to the intent of the plaintiff in error. And he must have had the full benefit of it, for the jury acquitted him of the intent to kill. They found that he killed the deceased, without design to kill him, by an imminently dangerous act, evincing a depraved mind, regardless of human life. These qualities of an act, done in plain view

and not denied on trial, are wholly outside of any doubt which good character could tend to raise. The danger of the act, the depravity of mind, the regardlessness of human life, belong essentially to the act itself, and are made by the statute dependent on it. The nature and qualities of the act producing death are to be found in the act and the circumstances of its commission ; and the good or bad character of the accused can have no possible bearing upon them.

This point was pressed upon us with much ability. And it was suggested that the evidence of good character might have tended to reduce the crime to one of the degrees of manslaughter, by raising a presumption that the homicide was committed in the heat of passion. But heat of passion, in such a case, is a fact to be proved, like any other, not to be presumed from mere good character. Evidence of irritable character might have some bearing on it, but not evidence of good character. And the office of good character, in criminal cases, is not to raise presumptions, but to rebut them; not to prove anything, but to solve doubts of proof. And here, in any view, there was no doubt to solve, for there was no evidence of heat of passion given.

It appears to us to be quite evident that the jury was not misled to the disadvantage of the plaintiff in error by any inaccuracy there may have been in the language of the charge; that he had all the advantage he could properly claim from his evidence of good character; and that the exception to the charge, if well founded in law, is wholly immaterial.

III. This brings us to the real question in this case, which is not free from much difficulty, and which has received from us long and careful consideration : the construction of our statutory definition of murder in the second degree, as applied by the court below to the crime of the plaintiff in error.

The plaintiff in error, who is an elderly man, and the deceased, were brothers, living on one piece of land. There had been, for some considerable time, a controversy between them,

in relation to the division of the land between them.   There was evidence tending to show deadly threats of the plaintiff in error against the deceased.   On the day of the homicide, the deceased, with a surveyor and his assistants, undertook to survey a line on the land, which the deceased asserted, and the plaintiff in error denied, to be the proper line of division.  The plaintiff in error, perceiving the party, came towards it, followed by his wife and another woman. .He carried an axe over his shoulder, presumably by accident.  He spoke of the trouble about the land to the surveyor, apparently without passion, but with strong sense of wrong.   Meanwhile, his wife was scolding the deceased, and the plaintiff in error seems to have been desirous to quiet her.   Soon he left the surveyor, and followed the group of whom the deceased was one.   It does not appear that the two exchanged look or gesture or word.   Suddenly, without any appearance of present provocation, the plaintiff in error seems to have struck the deceased on the back of the head with some blunt part of the axe, inflicting a bruise not dangerous, but apparently stunning the deceased, who did not stand on his defense.  Certainly, the plaintiff in error struck the deceased, with the sharp edge of the axe, over the forehead and face, a mortal blow, from which death ensued in a day or two.   The plaintiff in error, still retaining the axe, then pursued one of the party of the deceased for several rods, whether or not upon special provocation, whether or not with intent to do serious harm, may be considered doubtful.  Failing to overtake this person, he abandoned the pursuit and went to his house, rendering no assistance to the deceased, and seeming to pay no heed to him.   The deceased lay for some hour, more or less, where he fell, without assistance from any one, when he was removed to his house.

We cannot doubt that, on this evidence, the jury would have been warranted in finding the plaintiff in error guilty of murder in the first degree, and that the court could not properly have disturbed their finding.   But their verdict was of

murder in the second degree. And, though that is a lower degree of guilt, it raises a much more difficult question. It is immaterial to the question, that the punishment for the two degrees of crime is now the same. The conviction cannot be sustained unless the homicide shall be found to be within the statutory definition of murder in the second degree.

At common law, there were two crimes of homicide only, murder and manslaughter  Murder was the unlawful killing of a human being, with malice aforethought, express or implied; manslaughter was the unlawful killing, without malice, express or implied. But homicide was sometimes murder by malice imputed by law to the conditions under which it was committed.

The terms, express or implied, as applied to malice aforethought, led to some confusion in the books. Express malice was sometimes considered as malice positively appearing; sometimes as actual malice, whether positively or inferentially appearing. Implied malice was sometimes considered as malice, not positively, but inferentially appearing; sometimes as malice not at all appearing, but imputed by law: constructive malice. This was not only confusion of terms, but led to confusion of guilt, leaving the distinction between murder and manslaughter sometimes doubtful. This is more elaborately and accurately stated in the learned brief of Mr. Hill in 10 N. Y., 123. Our statement is sufficiently accurate to show the inducement to the modern policy of statutory definitions of crimes of homicide.

Pennsylvania, we believe, first undertook this. As early as 1794, that state, in substance, defined murder in the first degree, to be killing by any willful, deliberate and premeditated means, or in the commission of certain felonies; and declared all other murder to be murder in the second degree.

Whatever confusion there may sometimes have been in the terms or application of the common law, it was flexible in practice, and generally of easy application to the multiform

modes of homicide.   Its codification, in this and other in-
stances, is always difficult and sometimes dangerous; substitu-
ting fixed provisions for comprehensive principles.   And the
definitions of Pennsylvania were eminently wise in this, that
they did not assume to codify the whole law of homicide, or to
confine all crime of murder within formal definitions.   When
murder was found not to fall within the first degree, there arose
no necessity to search for a definition within which it would
fall: it came, without definition, within the collective decla-
ration of murder in the second decree.   That state did not in-
cur the risk which New York encountered, of seeing murder
which the courts held not to come within any of the statutory
definitions of the crime.   Massachusetts, Virginia and other
states followed the wise caution of Pennsylvania, although
sometimes adopting different conditions of murder in the first
degree.

The revised statutes of New York, of 1830, attempted the
more difficult and dangerous work of defining all crimes of
homicide by fixed statutory conditions.

The learned and eminent revisers reported four several defi-
nitions of murder.   These declared homicide to be murder,

1. When perpetrated from a premeditated design to effect
the death of the person killed, or of any human being ;

2. When perpetrated by an act imminently dangerous to
others and evincing a depraved mind, regardless of human life,
although without any premeditated design to effect the death
of any particular individual ;

3. When perpetrated without any design to effect death, by
any person engaged in the perpetration of any felony punishable
by imprisonment in a state prison, or engaged in an attempt to
to perpetrate such felony ;

4. When perpetrated from a premeditated design to do some
great bodily injury, without a design to effect death.

These definitions were designed by the revisers to include
all statutory murder ; and, with certain definitions of man-

slaughter, all murder at common law. And all the definitions were held necessary for this purpose. The revisers say of their four definitions of murder: " The great principle on which the section rests is this, that to constitute murder there should be an express design to take life, or such facts occurring in a transaction as would ordinarily lead to the result of taking life."

But the legislature, while adopting the rest of the section in nearly the words repeated, rejected the fourth subdivision of murder; leaving the definition of the crime, as understood and intended by the revisers, defective ; leaving unprovided for, in their view, a form of homicide which was murder at common law. In the view of the revisers, that particular form of murder was left undefined by the statute; in the view of the legislature, it is to be presumed, that form of murder was covered by some other of the definitions of murder or manslaughter. This seems a severe comment on the attempted codification, which left a *casus omissus,* afterwards encountered by the court of appeals in *Darry v. People,* 10 N. Y., 120. And so we find the definitions of New York almost confessedly defective in reducing the law of homicide to a code.

From this statute of New York, ours was taken in 1849. But it was taken with so vital a difference, that it cannot be properly said that it was copied.

In New York the four definitions reported by the revisers, and the three adopted by the legislature, were different conditions of one crime, without degree, subject to one punishment.

Here, their first definition was made murder in the first degree, punishable by death; their second definition, murder in the second degree, punishable by imprisonment for life; and their third definition, murder in the third degree, punishable by imprisonment for a term of years.

The second definition of the New York statute was not interpreted by the courts of that state, when our statute was adopted. This court is therefore free to put its own construction on it, as it did on another section, differing from some of

Hogan vs. The State.

the New York courts, in *Rowan v. State*, 30 Wis., 129. And, indeed, there seems to be a strong presumption that, borrowing the language of the New York statute, the legislature of this state took it in a sense of its own, different from the sense in which it seems to have been used in New York. It seems to be an unjust presumption that the two legislatures put the same construction on the language used; when the one made all the definitions one crime, with the one dread penalty which is the extreme of human punishment, and the other made them three different degrees of crime, with three momentously different rules of punishment. This is an additional reason why we should not follow the construction of the New York courts, if, in our view, we can find a different construction, satisfactory to us, and more harmonious with the legislative purpose in the distribution of the crime into degrees.

In *Darry v. People*, *supra*, the bar and bench went into a very elaborate, critical and somewhat subtle discussion of the intent and scope of their second definition of murder; and the court adopted a construction which was very strongly urged on us in this case, but with which we are not able wholly to agree. And it may be remarked, in passing, that in that case the court was not unanimous, and that in the opinions of the majority, there are material differences of reasoning.

That was a case of homicide, committed by cruel and protracted assault or series of assaults, which, in the absence of a design to kill, seems to us to have belonged to the class of cases provided for by the rejected fourth definition of murder. The court held it not to be within their second subdivision, corresponding with our murder in the second degree.

For the reasons already assigned, and because it would involve a long discussion not necessary to our decision, we shall not attempt any review of the reasoning of the court in that case. So far as we are compelled to dissent from it, the reasons for our dissent will sufficiently appear in the statement of our own views.

From the statement of the New York revisers of the principle on which they framed their four definitions of murder, it seems very probable that they intended to confine their first definition, corresponding with our murder in the first degree, to cases of actual design to take life; and to include in their second definition, corresponding with our murder in the second degree, "cases where circumstances induce a strong presumption of such a design, or are of such a nature as would ordinarily lead to the result of taking life."

They refer, for the source of their second definition, to this passage in Foster, 256: "When the law maketh use of the term *malice aforethought*, as descriptive of the crime of murder, it is not to be understood in that narrow, restrained sense to which the modern use of the word *malice* is apt to lead one, *a principle of malevolence* to particulars; for the law by the term *malice* in this instance meaneth, that the fact hath been attended with such circumstances as are the ordinary symptoms of a wicked, depraved and malignant spirit."

The New York court of appeals confined their second subdivision exclusively to cases of homicide from a general malice or depraved inclination to mischief, fall where it may. This was murder at common law. As if one willfully ride an unruly horse into a crowd, or throw a stone or fire a gun into a crowded street, or the like, with intent to do hurt, the probable danger being great and apparent, although without intent to kill, and one is killed by it. "It is murder on account of the previous malice, though not intended against any particular individual; for it is no excuse that the party was bent on mischief generally. But if the act was done incautiously, without any such intent, which must be collected from the circumstances, it is only manslaughter." 1 East's P. C., 231, sec. 18.

We quite agree with the New York court that the language of their second definition, our murder in the second degree, includes this class of cases. But we are unable to agree with them that it includes only cases of that precise character—only

cases where the wrongful act producing death is directed against several—and that it excludes cases of similar acts directed against one only.

In the language of the New York revisers, it seems very plain that circumstances may induce the presumption of a design to kill, or may be of such a nature as would ordinarily lead to taking life, in the one case as in the other; and that the language of Foster to which they refer, though it includes cases of general malice, does not exclude cases of particular malice. We see no reason for separating the two kindred crimes, so exactly alike in guilt, so exactly alike in all details except one, and that one detail resting in accident, not at all affecting legal or moral guilt. Indeed, they are essentially one crime, committed under different circumstances. We think that the manifest inclusion of the one, so far from indicating an exclusion of the other, imports a design to include both, unless the language used necessarily excludes one or the other. It is not to be presumed that the legislature intended the one to be murder and the other manslaughter. And if such were the effect of the language used, we should be inclined to consider it an accidental effect, against the policy of the statute; a mere consequence of an unfortunate use of words. The question, therefore, turns on the language used. And, adopting the view of SELDEN, J., in *Darry v. People*, that the new phraseology of the statute is to be construed by its own import, and not in the light of the old phrases of the common law, we will consider the precise terms used, so as to ascertain whether, fairly construed as a penal statute, it includes what we think it was meant to include, or whether it is such as to exclude it arbitrarily.

We shall not stop to inquire whether the definitions of murder and manslaughter are so distinct as to exclude from each whatever grade of homicide is provided for in another. We regret to say that we fear they are not. A very careful consideration of them has left a painful impression on our minds that they are, in some instances, somewhat inaccurate and ill

framed. We fear that they need revision. But while they stand, it is our duty to give the best construction we can to them, as they come before us.

As penal statutes these definitions of homicide are to be construed strictly, for the benefit of those accused under them. But this strict rule of construction is not to be taken in too literal and critical a sense. The statute is not to be extended beyond the plain meaning of its words. But the intention is not to be defeated by overstrict construction. The intent is to be ascertained, and not to be frittered away upon critical niceties. It is to be applied to all cases within the mischiefs and the words. Sedgwick, 326 – 7. And in the spirit of this rule we will examine the provisions before us.

We take the "premeditated design" of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent, and need not be slow or last long. This very plainly appears, not only by the force of the words used, but also by the apparent use, throughout the definitions of murder and manslaughter, of the terms, "design" and "premeditated design," to effect death, as co-equal terms.

The definitions of murder in the third degree, and of manslaughter in the first, second and third degrees, use the words "without design to effect death," thus positively excluding such a design. And the design so excluded is necessarily the premeditated design of murder in the first degree. But the definition of murder in the second degree does not use the same words, but instead, "although without any premeditated design to effect the death of any particular individual." The word "although" implies a doubt: a concession of something not positively determined. The phrase sounds, in a critical ear, as if design were not absolutely excluded; but that, the other conditions being present, the crime might be with or without design. It is lamentable that such careless and un-

certain language should be found in a statute of such solemnity.

The benignant policy of our statute is very manifestly to distinguish between homicides with and without intent to kill; and it would be a violence to the intention, not warranted by the letter, of the statute, to confound the two classes of crime, so inherently differing in guilt, and to put both in one degree. But the doubt arising from the unfortunate language has happily been already solved by this court, in this very case, when it was first here. Speaking of the degrees of murder, the court said: "An examination of the above statutes will show that murder in the first degree is the unlawful killing of a human being with *express* malice aforethought, that is with premeditation and deliberation, while murder in the second and third degrees is such unlawful killing with *implied* malice aforethought, that is the malice which the law implies from the depraved mind and recklessness of human life in the one case, and from the felonious act in which the slayer is engaged in the other case." *Hogan v. State*, 30 Wis., 428. That is to say, murder in the first degree goes on actual malice, and murder in the other degrees on constructive malice. So that we have the phrase "although without any premeditated design to effect the death of any particular individual," in the definition of murder in the second degree, so far as intent is concerned, declared equivalent to the phrase "without any design to effect death," in the definition of murder in the third degree.

Then the policy of the statute is determined, to put all statutory murder with actual intent to kill in one degree by itself, and all statutory murder with constructive intent to kill in the lower degrees of the crime.

The intent to take life, in the former case, may be to take the life of the person killed, or of another particular person, or of some person without discrimination. This is the design of the statute in the distinction, and the words of the statute are sufficiently comprehensive to include any killing with intent

to kill. This includes cases of general malice as well as of particular malice. And in cases of general malice, as of shooting into a crowd, if there be an intent to kill some one, but not to kill a particular person, it is murder in the first degree, by force of the intent; if there be no intent to kill any one, the other statutory conditions being present, it rests upon constructive malice, and is murder in the second degree. And the case of general or indiscriminate malice at the common law, may be within either of these statutory degrees, depending on the presence or absence of an actual intent to kill any human being. And so our murder in the first degree comprehends cases of both general and particular malice: the distinction resting, not on the direction or object of the intent to kill, but solely on the question whether or not there be an actual intent to kill some one, particularly or indiscriminately.

We can see, in principle, no more reason or propriety for confining the second degree of murder to cases of .general malice, than of excluding them from the first degree of murder, in a proper case. For it is not the circumstances of the homicide, but the actual or constructive intent, which is the ground of the distinction. It therefore seems to us to be reasonable and necessary to hold murder in the second degree to . include all cases of homicide, without actual intent to kill any one, committed under the other conditions of the statute, whether the malice which the law imputes be against several or against one only, unless the language of the definition necessarily confines it to cases of imputed malice against several.

The first condition of the statute is, that the act producing death shall be imminently dangerous to others. It has been said that every act producing death must be thus dangerous. Perhaps this is literally true. But the statute does not go on fortuitous or latent danger, but on essential and apparent danger, of the act producing death. The act must be inherently and consciously dangerous to life, not such as casually produces death by misadventure. It must be dangerous in and of

itself, as committed and when committed, whether death follow it or not. This we think not only the spirit of the statute, but the letter also, implied by the words used. Again, it has been said that the words, " to others," imply that the act must be dangerous to several. We cannot think that the words were so intended. The statute would certainly have been more perspicuous without them ; and we do not overlook the rule that we are to give them some effect, if possible. But it is our duty, if we can, to give them such effect as will aid, not mar, the object of the statute. And, within the rule of construing penal statutes, we do not feel at liberty, if we can avoid it, to give to these words such a construction as will exclude from the definition a class of crimes which we think clearly within its intent. We are not only at liberty, we are bound, to hold the phrase in the singular, as well as in the plural, if necessary to the true construction and application of the statute. R. S., ch. 5, sec. 1. This was the rule of construction with which the statute was adopted. And we take the true effect of the words to be, that the act shall be dangerous to other or others, that is to say, than the person committing it. One may do an act essentially dangerous to himself, and not apparently so to others. Such an act would not be within the statute.

Then the act shall evince a depraved mind, regardless of human life. These qualities of the act equally apply to one or many. And we have the act producing death, imminently dangerous to others, and evincing a depraved mind, regardless of human life, the essence of the crime, all corresponding with particular malice as well as with general malice. They do undoubtedly include cases of general malice, but as undoubtedly do not exclude cases of particular malice. And when all the same essentials of guilt apply as well to one case as to the other, it ought to take great force of language, incidentally used in the statute, to exclude either. It is clearly the purpose of the statute to include both, because the essential elements of crime are identical in both.

Such are the positive conditions of the crime. Then comes the negative, " although without premeditated design to effect the death of any particular person." This is not a quality or condition of murder in the second degree, but is the exclusion of a quality or condition not belonging to it, to distinguish it from murder in the first degree. After setting forth the conditions which shall be necessary to constitute the crime, the statute goes on to state what shall not be necessary ; to state what is irrelevant to it, as belonging to a higher grade of crime. And, if there be any apparent incongruity between the language used in defining the positive qualities, and that used in defining the quality excluded, we take it to be a sound rule of construction that the terms of the positive qualities shall control the terms of the excluded quality. The positive provisions of a statute prescribing what shall be necessary to constitute a crime, are not to be defeated by any inaccuracy or ambiguity of language, having no reference to them, employed in stating what shall not be necessary to it. The crime consists in the positive qualities, not in the negative. And if the former be certain in themselves, they cannot be made uncertain by the latter. But the incongruity here is perhaps more apparent than real. While we can see that the phrase, "any particular person," was used with more direct reference to cases of general malice, we cannot see that it was used to exclude cases of particular malice. The want of intent to kill *any* person, certainly includes the want of intent to kill one particular person. In any view of the provision, the language is not very happily used. The absence of intent to kill any particular person might be critically held not to exclude an intent to kill some person. But such a construction would be inadmissible, because it would defeat the statutory purpose of dividing murder into distinct degrees of crime, turning on the presence or absence of actual intent to kill. And while the difficulty seems to have arisen from the use of language unhappily and inaccurately chosen, to provide *ex industria* for cases of general mal-

ice, there is certainly in it no apparent design to exclude cases of particular malice, otherwise clearly within the definition.

In our view of murder in the second degree, it goes in any case upon constructive intent to kill, intent imputed by law where there is no actual intent to kill. And this we hold to be expressed in the statute, in language sufficiently comprehensive to include all cases meeting the conditions of the crime, whether proceeding upon general or particular malice, without any words sufficient to exclude either.

The jury acquitted the plaintiff in error of intent to kill any human being. They found that his act producing death was imminently dangerous to others and evincing a depraved mind, regardless of human life. If he had aimed the fatal blow at the group of persons who came upon the land with the deceased, indiscriminately, it is admitted that his crime would have been murder in the second degree. Why or how, in reason or in law, should his crime be different because he amied the blow at the deceased only? ]How or why was the act more or less dangerous to others, or more or less evincing a depraved mind, regardless of human life? How or why, when the plaintiff in error intended to kill no one, was there more or less want of any design to effect the death of any particular individual? `It seems to us that, if the plaintiff in error was not guilty of murder in the first degree, all the conditions of murder in the second degree, positive and negative, apply to his case, as clearly as if he had rushed into the group and struck the fatal blow indiscriminately.

A different construction of the statute would convict and punish for murder in the second degree a crime committed towards several, involving the death of one only, and reduce the same crime, committed against the one killed alone, with all the same qualities and conditions, with the same moral and legal guilt, to manslaughter. The imminently dangerous act evincing a depraved mind, regardless of human life, distinguishes this grade of crime from manslaughter, as the want of

intent to kill distinguishes it from murder in the first degree; and we see no reason why it should not so distinguish it in all cases, whether of general or special malice.

The statutory definitions of homicide were intended to take the degree of guilt out of the subtleties of the common law. And we have therefore not considered ourselves at liberty to consider the language of the statute in the light of those subtleties. We have considered the question without any subtlety of reasoning, upon the plain policy and purpose of the statute and the reasonable construction of the language employed.

We carefully considered the case of *Darry v. People, supra*, before we came to this conclusion. As already seen, the question there was not altogether the same. We admire the extent of learning and acuteness of reasoning exhibited in that case. But, while we concur in the positive construction which the court in that case gives to the statute, we have not been able to adopt their negative construction, excluding cases of particular malice.

The court below seems to have put substantially the same construction on the statute as we do, and charged the jury accordingly. We think the charge was correct.

And, as these points dispose of all the grounds of error assigned in this court, the judgment of the court below must be affirmed.

*By the Court.*—Judgment affirmed.