CUPPS, Plaintiff in error, vs. THE STATE, Defendant in error.

*October 24, 1903—February 23, 1904.*

*Criminal law and practice: Murder in the first degree: Intent: Presumptions: Evidence: Burden of proof: Motive: Character: Exceptions: Instructions to jury: Appeal and error: Prejudicial error: Questions reviewed: Verdict: Impeachment: Misconduct of jurors.*

1. If a person inflicts upon another a fatal wound, intending thereby to cause that other's death, and such intention is effected, there being no attending circumstances rendering the homicide justifiable or excusable, such person is guilty of murder in the first degree.

2. If a person takes the life of another by an act naturally calculated to produce that result, in the absence of any explanatory circumstance or circumstances rendering the homicide excusable or justifiable, or criminal in some degree less than the highest, or creating a reasonable doubt in regard to one of such contingencies, the law presumes that he intended the result effected and is guilty of murder in the first degree.

3. Proof that a person took the life of another by an act naturally calculated to effect that result *prima facie* establishes guilt to the fullest extent charged.

4. At the point last suggested the burden is cast upon the accused to rebut the *prima facie* case made against him to the extent indicated in No. 2, or the jury will be warranted in finding a verdict of murder in the first degree.

5. An apparent motive for the commission of a criminal offense is not an essential to a conviction thereof. Mere proof of motive does not of itself establish guilt, nor proof of want of motive establish innocence. Such proof is entitled to just such consideration in arriving at the truth of the matter as the jury think ought to be given thereto; and the same principle governs in respect to proof of the character of the accused prior to the time of the alleged commission of the offense inconsistent with the truth of the charge.

6. If a jury, upon the whole evidence produced for their consideration in a criminal case, believe the accused guilty beyond a reasonable doubt, it is their duty to so find, regardless of whether they can discover therein an adequate or any motive for the commission of the offense; and also regardless of whether they believe that the character of the accused before such commission was inconsistent therewith.

7. An exception to a particular ruling striking out evidence as not responsive to the question asked, does not preserve for review the proposition of whether such evidence was competent, even though the trial judge expresses an opinion in connection with his ruling that it is not.

8. In giving instructions to a jury in a criminal trial, it is not reversible error for the judge to speak of facts as established in the cause which are so beyond any room for reasonable debate.

9. If a trial judge, in charging a jury in a criminal case, makes an incorrect recital of a fact as to whether it is established or not, if the evidence is all one way and so plain that there is no room in reason for the jury to misunderstand it notwithstanding the incorrect statement, the language of such recital being reasonably harmonizable with the truth of the matter, such mistake does not constitute reversible error.

10. In a prosecution for murder in the first degree, if the evidence in the judgment of the trial judge in any reasonable view thereof will not warrant a verdict of any other homicidal offense than that of murder in the first degree, it is his duty to so instruct the jury.

11. While it is the duty of the judge, in a prosecution for a homicidal offense, to instruct the jury as to every degree thereof to which the evidence, in any reasonable view of it, will apply, a failure so to do of his own motion does not constitute reversible error.

12. An exception to the charge, in a prosecution for murder in the first degree, that the accused should, on the evidence, be convicted of the full offense charged against him or acquitted, does not preserve for review the question of whether instructions should have been given as to other degrees of homicidal offenses.

13. The rule applies in criminal as well as in civil cases, that failure to instruct the jury upon a material point is not reversible error unless a written request to charge upon such point, in proper form to be given to the jury, is seasonably presented to the trial judge and the request is refused.

14. The court having charged the jury, in a prosecution for murder, that they should weigh the evidence of each witness "as best they can," and in the performance of the duty of "scrutinizing the evidence and determining its effect, you should exercise the utmost caution, employ all the reason, prudence, judgment and discrimination that you possess and would summon to your own aid in the most important affairs of life," it is not error to refuse to instruct that in performing such duty, the jury should use "the utmost care, caution," etc.

15. It is not error to refuse to instruct the jury in a criminal case that, "unless you can say from that standpoint that the evidence fails to impress your minds with any reasonable doubt of the defendant's guilt, you should acquit the accused and render a verdict of not guilty," because, if the idea involved is not clearly erroneous, the language is fatally ambiguous.

16. The inclusion of a request to charge the jury as indicated in the preceding paragraph would render the entire request fatally defective.

17. The proper instruction, in substance, to give to the jury on the subject covered by the two last foregoing paragraphs is that, after giving to the evidence the consideration indicated by the instruction mentioned in paragraph 14, there then remains in the minds of the jury no reasonable doubt of the defendant's

guilt they should convict him, otherwise they should acquit him.

18. A requested instruction, so framed that in any reasonable view it assumes a state of things as established by the evidence not so established beyond room for reasonable debate, is fatally defective.

19. If counsel desire a specific instruction on any particular point, they should prepare such instruction in writing in the form they desire it to be given to the jury, and ask the court to give it. As a general rule a mere request to charge upon a particular point, or to charge more particularly thereon, a refusal thereof and an exception to the ruling, do not present any question for review.

20. Where the verdict of the jury is sought to be impeached for misconduct of some member thereof in respect to his answers upon the voir dire, or in respect to his conduct during the trial, or for undue outside influence upon the jury during the trial, the facts in that regard, to be effective, should be established by clear and satisfactory evidence.

21. The determination of the trial judge respecting the facts in regard to any matter referred to in the last foregoing paragraph is as conclusive as his determination upon any other matter of fact, in that it must be regarded on an appeal as a verity unless shown to be contrary to the clear preponderance of the evidence.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Clark county: CHAS. M. WEBB, Judge. *Affirmed.*

November 27, 1900, at about two o'clock a. m., Ollie O'Dell, the keeper of a house of ill fame, located a short distance from Stanley, Clark county, Wisconsin, was there fatally shot by some one. Death occurred a few moments after the wound was inflicted. There were no witnesses to the homicide except plaintiff in error and one Ole Gustad. They were jointly informed against as having with malice aforethought taken the life of Mrs. O'Dell. Separate trials were granted. Gustad was tried first and acquitted. Plaintiff in error was tried shortly thereafter and was convicted of the full offense charged. Judgment was pronounced accordingly. To review such judgment upon exceptions taken at

the trial, and thereafter, the cause was brought here by writ of error.

*R. J. MacBride,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *Walter D. Corrigan,* second assistant attorney general, and oral argument by *Mr. Corrigan.*

The following opinion was filed November 17, 1903:

MARSHALL, J.   The main contention upon which counsel for plaintiff in error relies for a reversal is that the evidence was not sufficient to warrant a conviction of murder in the first degree if of any offense; though it does not seem to be urged with confidence but that the evidence justified a conviction of guilty of some homicidal offense.   Preliminary to the discussion of such contention we will briefly state the salient evidentiary facts which the testimony either established or so strongly tended to prove as to warrant the jury in finding their existence.

Ole Gustad and plaintiff in error were young men.   The latter was about twenty years of age.   He lived a reputable life till about a year prior to the homicide.   Gustad was twenty-three years of age.   For several years prior to the homicide he had associated with bad characters and generally lived a disreputable life.   In June, 1899, or a month or two prior thereto, plaintiff in error, at St. Paul, Minnesota, began to associate with Iva Drake, an unmarried woman, knowing that she was of bad character and pregnant. She gave birth to a child shortly after such acquaintance commenced.   He married her prior to July, 1899.   During the time he associated with her prior thereto she had a companion of bad character by the name of Ella Day, a favorite of Ole Gustad.   The acquaintance of plaintiff in error with the latter commenced after he began to associate with Iva Drake.   After that event the two young men chummed together, more or less, till after the homicide.   After plaintiff

in error and the Drake woman were married they spent several months going about from place to place, apparently not having any honorable means of support. In company with Ella Day they arrived at Stanley in the latter part of October, 1899. On the morrow a livery rig and driver were procured, and the two girls with plaintiff in error, were driven out of the village, a short distance, to Mrs. O'Dell's house of ill fame. Plaintiff in error knew the character of the house. He left his wife there apparently consenting that she should remain and encouraging her to do so and to live the life common to such places, he returning to Stanley, where he resided for several weeks doing nothing but taking care of a little child of Ella Day, the two girls paying his expenses from the fruits of their immoral life. At the end of that period Gustad joined him and the two went to St. Paul to obtain work. About a week after they arrived in St. Paul they returned to Stanley, leaving St. Paul on the evening train of November 26th, and arriving in Stanley a little before twelve o'clock p. m. of that day. *Cupps* had upon his person a revolver. Gustad had no weapon. When the two arrived at Stanley they avoided being observed by the train crew. When the train moved out of the station they went into the waiting room of the depot and sat down by the stove, indicating by their manner a disposition to avoid being recognized. After remaining there about an hour, at the suggestion of *Cupps* they started for the O'Dell place, where they arrived at about two o'clock a. m. One of them immediately rapped at the door and it was promptly opened by Mrs. O'Dell. She was the only person in the lower part of the house. Mrs. Cupps, the Day girl, and one Anna Wing were upstairs and were the only occupants of the house except the O'Dell woman. The Day girl was in a room by herself at the head of the stairs. As soon as Mrs. O'Dell opened the door a noise as of persons entering the house was heard, and immediately thereafter the O'Dell

woman was heard to exclaim: "My God, don't shoot me!" or words to that effect. Immediately thereafter a pistol shot was heard, followed by an exclamation from the woman: "They have killed me, they have killed me!" or words to that effect. Sounds as of the persons who entered the house hurriedly leaving the same, were then heard. The woman was then heard to groan several times, and thereafter all was still in the lower part of the house. The girls remained upstairs till morning. They then called to a passer-by, resulting in an investigation being made and Mrs. O'Dell being found where she was last heard, lying upon the floor dead, with a pistol wound in her neck. Immediately after the shooting *Cupps* and Gustad hurriedly returned to Stanley, where they secreted themselves behind some box cars till a train arrived, bound for St. Paul. They boarded the train, avoiding being observed by the train crew, and beat their way to St. Paul, arriving there before noon. Soon thereafter plaintiff in error sold his revolver, saying that he had no further use for it. About a week after they returned to St. Paul the two men were arrested, charged with being guilty of the murder of the O'Dell woman. After the arrest plaintiff in error claimed that he was not at Stanley on the night of the homicide. On the preliminary examination he admitted that he and Gustad visited Stanley on the night of the homicide and that they both started for the O'Dell place. He claimed, however, that he had some altercation with his companion, which resulted in his turning back while Gustad went on; that he was not present at the O'Dell place at the time of the shooting; that Gustad overtook him before he arrived at Stanley and that the two soon thereafter reached Stanley, boarded a passing train, and went to St. Paul. He claimed that he did not know that the O'Dell woman was shot, but suspected it. His story in justice court was different in many respects from the one he told upon his trial in the circuit court. He then admitted being present when the

woman was shot and said that his testimony in justice court inconsistent with that given upon his trial was false. He claimed that while the two were on their way to the O'Dell place Gustad borrowed his revolver ostensibly to shoot at something by the wayside; that he discharged the weapon and then reloaded it, having in his possession some cartridges which belonged to the accused; that he returned the revolver to the accused shortly after they left the O'Dell place. He testified that as soon as they entered such place Gustad drew the revolver and shot the woman; that he was then about to go upstairs in search of his wife, and that the woman, when shot, was directly between him and Gustad, facing the latter. Gustad denied having the revolver in his possession on the night of the homicide at all. He testified that plaintiff in error, as soon as they entered the O'Dell house, drew his weapon and shot the woman. Both agreed that immediately after the shooting they hurriedly returned to Stanley, secreted themselves till a train came along, and then boarded the same for St. Paul, reaching there as before stated.

The foregoing statement seems to be sufficient, without argument, to answer counsel's contention that there was no evidence produced upon the trial to warrant the jury in finding a verdict of murder in the first degree. True, the direct evidence as to who did the shooting was confined to the two men, the accused and his companion, who were the sole witnesses of the homicide; but there were evidentiary circumstances tending to show that plaintiff in error was the guilty party and that the two visited the O'Dell place upon the night of the homicide, one or both being bent upon an unlawful purpose of a serious nature, and probably the one that was effected. There was the evidence tending to show that both endeavored to avoid recognition while at Stanley; that they purposed, before leaving St. Paul, to go to Stanley and return in such a way as to render their absence from St. Paul unobservable; that plaintiff in error was the leader of the

expedition; that he owned and was in possession of the weapon with which the homicide was committed, and that his story of the shooting was highly unreasonable in that he claimed that, when Gustad fired the shot, the woman was standing in a direct line between them, face to face with Gustad. As before stated, however, on the question of who did the shooting, we do not understand that counsel for appellant contend but that there was evidence to warrant the jury in finding that plaintiff in error did it; the point argued being that no evidence was produced showing that the shot was fired with the intention to take human life, requisite to the crime of murder in the first degree. To our minds the evidence on that point seems to have been ample to warrant the jury in the conclusion which they reached. The location of the wound indicates that it was inflicted with a pistol pointed at the woman's neck and probably slightly downward. Whoever fired the shot must have had his arm raised to a position quite inconsistent with an accidental discharge of the pistol during a struggle between him and the woman. There were no powder marks upon the deceased, indicating quite clearly that she and her assailant were not near enough together at the time of the homicide to be in physical touch with each other. The location of the wound and the other circumstances strongly indicated that the wound was intentionally inflicted. It was in a vital part of the body, giving rise to the familiar legal presumption that whoever inflicted it intended to produce the result which followed, such result being a natural and probable consequence of the act. Add to that the fact that the woman exclaimed the instant before the shot was fired, "My God, don't shoot me!" and exclaimed immediately after the discharge of the pistol, "They have killed me, they have killed me!" or words to that effect, and we have a pretty strong showing that whoever fired the fatal shot did so intending to accomplish what in fact resulted. That satisfies all the essentials of murder in the first degree,

though there may not have been any definite or considerable period of time between the formation of the design to kill and the effectuation thereof. It is sufficient to satisfy the statute if the person committing the homicide has, at the time of inflicting the fatal wound, a design to take human life, and inflicts such wound with the purpose of accomplishing such design, and that death ensues, there being no circumstance to render the homicide excusable or justifiable. *Hogan v. State,* 36 Wis. 226, 244; Id. 30 Wis. 428; *Perugi v. State,* 104 Wis. 230, 80 N. W. 593.

While, on account of the evidentiary circumstances to which we have alluded, aside from the fact of killing by means naturally calculated to effect death, the case as to the degree of criminal homicide of which the person who fired the fatal shot was guilty, did not depend upon the presumption arising from the fact of killing and the manner thereof, .in that it was by means naturally and probably calculated to produce death, if it did so depend we could not agree with counsel that such presumption goes only to the question of whether the homicide was criminal or not; that it was not sufficient to prove the character of the offense. From the circumstance of the taking of the life of a human being by the act of another naturally and probably calculated to cause that result the law presumes that such person, when he perpetrated the act, foresaw and intended the result which followed, hence must be guilty of the highest offense of criminal homicide known to our law, in the absence of evidence showing that the homicide was justifiable or excusable, or sufficiently rebutting the presumption of intent to take human life, to raise a reasonable doubt on the question. That must be so, since under our statute every intentional taking or human life not excusable or justifiable is murder in the first degree. *Perugi v. State, supra.* When it is made to appear in the prosecution of a case like this that the accused fired the shot, the weapon being aimed at a vital part of the

body, and that death ensued as a natural and probable result, the presumption of fact as to intention to take human life, in the absence of any explanatory circumstance or evidence, makes a *prima facie* case for the prosecution. The state is not bound to go further and negative any probability that the occurrence was the result of accident, or that there were circumstances reducing the homicide below that of murder in the first degree, or excusing or justifying it altogether. The accused at that point must take up the burden of rebutting the *prima facie* showing made against him. He must show, by evidence at least sufficiently convincing to raise a reasonable doubt as to the intention to take human life or as to whether such taking was justifiable or excusable, that there was no such intention, justification or excuse, or the jury will be justified in finding him guilty of the highest offense of criminal homicide. That rule is elementary. We quote from 3 Greenl. Ev. § 14:

"This rule, that every person is presumed to contemplate the ordinary and natural consequences of his own acts, is applied even in capital cases. Because men generally act deliberately and by the determination of their own will, and not from the impulse of blind passion, the law presumes that every man always thus acts, until the contrary appears. Therefore, when one man is found to have killed another, if the circumstances of the homicide do not of themselves show that it was not intended, but was accidental, it is presumed that the death of the deceased was designed by the slayer; and the burden of proof is on him to show that it was otherwise."

That burden is successfully raised, as we have seen, if the accused produces evidence sufficient in the judgment of the jury to raise a reasonable doubt as to the felonious intent. This subject was very fully discussed by Chief Justice SHAW, in *Comm. v. York,* 9 Metc. 93. The conclusion there reached is fairly stated in the syllabus thus:

"When, on the trial of an indictment for murder, the killing is proved to have been committed by the defendant,

and nothing further is shown, the presumption of law is that it was malicious, and an act of murder, and proof of matter of excuse or extenuation lies on the defendant."

By reference to the opinion it will be seen that the term "murder" in the syllabus means killing with malice aforethought, or murder in the first degree under our statute. That is stating the rule broader than is necessary for the purposes of this case, and broader than we would advise giving it to a jury. The better way is to state that, in the absence of evidence to the contrary, he who takes the life of another by the infliction of a wound or some act naturally and probably calculated to produce death, is presumed to have intended that result and to be guilty of murder at the common law, and murder in the first degree under our statute. Chief Justice SHAW, speaking of the nature and force of the presumption, said:

"The willful and voluntary act of destroying the life of another is . . . injurious in the highest degree to the rights of such other. . . . The natural and necessary conclusion from such an act willfully done, without apparent excuse, is that it was done *malo animo,* in pursuance of a wrongful injurious purpose, previously, though perhaps suddenly, formed, and is therefore 'a homicide with malice aforethought.' " Page 104.

"The presumption of malice . . . is not technical or artificial, . . . but is the result of a mode of legal reasoning which is of general application." Page 105.

Counsel for plaintiff in error freely admits that the law is as thus stated as applied to murder at the common law, but insists that the rule is different under our statutory system. No very good reason is advanced to support that idea, and no authority in support thereof is cited. Murder at the common law was susceptible of being established solely by the presumption arising from the fact of killing by an unexplained act naturally and probably calculated to produce death. That was laid down distinctly as early as *King v.*

*Woodburne,* in 1722, 16 How. St. Tr. 54. We see no room for holding that such ancient rule, which obtains to this day, admittedly, as to murder at the common law, does not apply to our statutory murder in the first degree, since that includes every intentional killing of a human being by another, not justifiable or excusable. Decisions made under systems unlike ours necessarily cannot affect the question. The law is different in the state of Ohio, and perhaps in other states. The difference in Ohio, however, grows solely out of the fact that intentional killing under the Ohio statutes is a characteristic of murder in the second as well as in the first degree. In that situation the court held that the presumption of intention to take human life arising from an unexplained homicide should only go to the lowest degree of the offense in which the intent to kill was essential. *State v. Turner,* Wright (Ohio) 20.

Now, while the jury were warranted in finding many evidentiary circumstances corroborating the legal presumption from the fact of killing by an act naturally calculated to produce that result,—which we have seen was of itself, unexplained, sufficient to support the finding of the taking of human life with malice aforethought,—we are unable to discover any evidence or circumstance tending to rebut the presumption except that tending to show absence of motive. True, there was a feeble attempt to show a probable accidental discharge of the pistol, and, certainly, from the circumstances of the homicide which we have detailed and the appearances thereafter the jury were fully warranted in giving little or no credence thereto. No explanation whatever was attempted of why the revolver was drawn on the defenseless woman at all; while the location of the wound and the absence of powder marks on the body of deceased or her clothing, and the entire absence of anything about her person indicating a struggle with her assailants, show pretty clearly, as before indicated, that the weapon was aimed at a

vital part of her body and was intentionally discharged by the person who held it.

Much significance is claimed for the dearth of evidence showing any substantial motive for the commission of the offense. If in a case like this evidence of guilt were so weak as to necessarily leave a reasonable doubt in the mind on the question of guilt in the absence of any proof of motive for the deed, that circumstance would have all the significance claimed for it; but such is not the situation here. Absence of motive in a doubtful case is always significant and may be of controlling import. But where the evidence, in the judgment of the jury, clearly establishes an intention, without justification or excuse, to destroy human life, the fact that no adequate or any motive can be assigned for the deed does not militate against such act being criminal, nor against the degree of criminality being the highest known to the law. A conviction is never to be disturbed merely for want of motive where there is credible evidence of guilt. 1 McClain, Crim. Law, § 416. The expressions of courts on this subject are numerous and harmonious. In *Pointer v. United States,* 151 U. S. 396, 14 Sup. Ct. 410, it was said, in effect: Proof of motive for the crime is not indispensable to conviction; for murder may be inferred from the mere fact of killing; but the absence of evidence suggesting a motive is a circumstance in favor of the accused to be given such weight as the jury may deem proper. In *Clifton v. State,* 73 Ala. 473, the court said:

"The presence or absence of a motive for the commission of the offense charged is always a legitimate subject of inquiry. . . . But it is not in any case indispensable to a conviction; it is not an element of the burden of proof the law devolves upon the prosecution, whether the agency or connection of the accused is manifested by direct and positive evidence, or only by circumstantial evidence, that a motive, or inducement, to commit the offense should be proved. The criminal act, and the connection of the accused with it,

being proved beyond a reasonable doubt, the act itself furnishes the evidence, that to its perpetration there was some cause or influence moving the mind."

In *McLain v. Comm.* 99 Pa. St. 86, 99, the court, speaking on the same subject, said:

"The commonwealth was not bound to establish an adequate motive for the alleged crime. . . . The fact of murder being established the inability to discover the motive does not disprove the crime."

Thus it will be seen that while it is competent for the prosecution in a case of this kind to show motive, it will not of itself establish the charge; and while it is competent for the defense to establish want of motive, it does not constitute a defense, nor necessarily rebut evidence by itself satisfactorily establishing the guilt of the accused even so as to raise a reasonable doubt on the question. Presence or absence of motive in any case, as indicated, is but a mere evidentiary circumstance to be given just such weight by the jury as they deem the same entitled to under all the circumstances. So here, the failure of the prosecution to show any motive for the commission of the offense charged against the accused is of little moment, the jury having presumably given due weight thereto and the evidence being sufficient, notwithstanding the absence of any discoverable motive for the offense, to warant the verdict which was rendered.

Counsel for plaintiff in error, to sustain his contention that the verdict of the jury was not warranted by the evidence, points with confidence to the proof of previous good character of the accused up to about a year before the commission of the offense. We must say that such evidence of good character was entitled to very little if any weight in view of the proof that the accused was a man of mature years, more than ordinarily bright, a man capable of earning upwards of $60 per month at mechanical labor, and yet that he took for his wife a common prostitute knowing her char-

acter, and thereafter encouraged her to continue her immoral life, he profiting by the fruits thereof, and it further appearing that he indulged in going about the country, beating his way on railroads and living the life of a common tramp. However, at best the evidence of good character did not constitute a defense. Counsel for the accused of course does not claim that for it. It was entitled to just such consideration as the jury thought proper to give to it under all the circumstances of the case,—no more and no less. The fact of previous good character, like that of absence of motive for the commission of the crime, is of no significance in any case in the face of satisfactory evidence of guilt, in the judgment of the jury, after giving due weight to such previous character. We must assume that there was such satisfactory evidence in the judgment of the jury in this case, since there is nothing to indicate that they did not give due weight to all the evidence produced before them. If they believed from such evidence beyond reasonable doubt that the accused committed the offense charged against him, it was their duty to render the verdict which they did, though they could not discover any motive for the deed, and though they believed that prior to the commission of the offense his character was inconsistent with such commission.

The only error assigned to rulings on evidence is that the court erred in granting a motion to strike out an answer which it appears was not responsive to any question asked. Arnold Lunt, after qualifying to testify as to the reputation of the accused as a peaceable, law-abiding citizen prior to the commission of the offense, in answer to a proper question said that it was good. Counsel for the accused, apparently to cause the witness to emphasize his answer to this question, asked: "His reputation in that respect was good?" referring to the reputation of the accused as a peaceable, law-abiding citizen, to which witness said: "In every respect it was good." That answer was clearly subject to the mo-

tion to strike out. The motion was general. The specific ruling of the court was that the answer should be stricken out so far as not responsive to the question. True, the court said in connection therewith that the inquiry in respect to the character of the accused was only competent in respect to his reputation as being a peaceable and law-abiding citizen; but the ruling was as indicated. An exception to that did not raise the question which counsel argues. Whether the saying, as to a person on trial for the crime of murder, that only his character as a peaceable and law-abiding citizen is involved, is strictly accurate, does not seem to arise so as to require discussion or decision.

The learned circuit judge, in the instructions to the jury, recited numerous facts as to which the evidence was all one way and which were unquestionably established, in which he said that after the homicide the accused and his companion walked back to Stanley. Counsel insists that such recital was an invasion of the province of the jury and was clearly prejudicial to the accused in respect to the statement that he and his companion walked back to Stanley, the testimony being that they ran back, indicating mental excitement. As to the general claim that it was error for the court to speak of facts as established in respect to which there was no debatable question, that was not an invasion of the province of the jury. Strictly speaking, the statement made by the learned court that the accused and his companion walked from the O'Dell place to Stanley was contrary to the evidence. The only testimony on the subject was that of accused and his companion. It is true, as counsel for plaintiff in error states, that both testified that they ran. However, we fail to see how the jury could reasonably have been prejudiced by such inaccurate statement. The men returned on foot to Stanley immediately after the homicide. In all reasonable probability, in view of the evidence, which was undisputed and very plain, that is what the jury understood

was in the mind of the court. The act of running back to Stanley, after the homicide, in a state of excitement, was certainly more indicative of guilt than would have been an act of walking back with the unconcern which the language of the court would indicate, taking the same in its literal sense. However, as before indicated, the evidence being plain and all one way that the accused and his companion returned to Stanley on a run, the jury must have understood the court merely to mean that they returned, as they in fact did, on foot.

Error is claimed because the court instructed the jury:

"There is no evidence in this case that tends to show, nor is any such claim made in the defendant's behalf, that the defendant killed the deceased under circumstances such as rendered such killing either justifiable or excusable. On the trial the defendant insists that he did not in any way contribute to the death of Mrs. O'Dell. The question therefore is to be determined by you from the whole evidence in the case, considered within appropriate legal rules as here stated by the court: Did the defendant shoot and kill Mrs. O'Dell, and, if he did, then was such killing perpetrated pursuant to a premeditated design by the defendant to take her life?"

That assignment of error raises the question of whether the court was warranted in taking from the jury the question of whether the killing of Mrs. O'Dell was justifiable or excusable. We are unable to perceive why the court was not so warranted, and the instruction objected to strictly proper. Counsel made no attempt to point out anything in the evidence indicating justifiable or excusable homicide. The whole attitude of the accused, from first to last, was, as the court said in the instruction, inconsistent with any other theory than that he was guilty of murder in the first degree or not guilty. His story was that he did not do the deed or have any concern with it. There was no room whatever in the evidence, in any reasonable view of it, for a finding that he had any legal excuse or justification for killing the

woman or injuring her in any way whatever. In that situation the court was justified, in fact it was its duty, to fence in the considerations of the jury as was done. A court in charging the jury in a criminal or any case is by no means confined to a mere statement of abstract principles of law applicable to the evidence. It may properly speak of evidentiary facts as established, as before indicated, as to which the evidence is so conclusive as not to leave any room for debate in respect thereto, and thus bring the minds of the jury to a definite understanding of the particular primary subjects for their consideration before taking up the ultimate issue of whether the accused is guilty or not. This and other courts have often held that where the evidence in a prosecution for murder in the first degree will support the full charge, and in no reasonable view of it will support a conviction for any less homicidal offense, it is competent for the trial judge to say that to the jury and to direct them to restrict their deliberations accordingly. *Fertig v. State,* 100 Wis. 301, 75 N. W. 960; *Dickerson v. State,* 48 Wis. 288, 4 N. W. 321; *State v. Kilgore,* 70 Mo. 548; *State v. Stoeckli,* 71 Mo. 559. The limitation upon the right of a trial court to speak of facts as established in charging a jury has often been said to be that it must stop where in any reasonable view of the evidence there is room for debate as to where the truth lies. *Benedict v. State,* 14 Wis. 423; *Hill v. State,* 17 Wis. 675; *Dingman v. State,* 48 Wis. 485, 491, 4 N. W. 668; *Salladay v. Dodgeville,* 85 Wis. 318, 326, 55 N. W. 696; *Little v. Iron River,* 102 Wis. 252, 78 N. W. 416. The general view of this subject as held by the highest courts of the country is summed up in 11 Ency. Pl. & Pr. 116, thus:

"An instruction which assumes the existence or non-existence of material facts in issue invades the province of the jury, and is erroneous if there be any evidence in conflict with such assumption."

That statement could be improved upon, it seems, by using the expression: "If there is any evidence or want of evidence in conflict with such assumption," since the court cannot properly assume the existence of a material fact merely because there is no negative evidence on the subject. The assumption in a criminal case must be based upon evidence establishing the fact so conclusively, as said in the decisions of this court before cited, as to leave no room for debate on the subject.

There is a further answer to that feature of the assignment of error last discussed which relates to the court instructing the jury to consider only the question of murder in the first degree: that, according to the repeated rulings of this court, the accused was not prejudiced, since no request was made for submission to the jury of other degrees of homicidal offenses than murder in the first degree. A general exception to the submission of only murder in the first degree did not raise the question of whether the lesser degrees of homicidal offenses should be submitted. The only way that could be done was by specially requesting the court to instruct the jury as to the lesser degrees. *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Fertig v. State, supra; Dickerson v. State, supra.* True, it is the duty of the court in the trial of such a case as this, to instruct the jury as to every homicidal offense to which the evidence, in any reasonable view of it, can apply. *Hempton v. State,* 111 Wis. 127, 86 N. W. 596. But, just as true, it is its plain duty, if the evidence in any such view will not support a conviction of any other homicidal offense than murder in the first degree, to say so to the jury.

The court refused to grant the request of counsel for the accused to instruct the jury that:

"It is your duty to scrutinize the evidence in this case with the utmost caution and care, bringing to that duty the reason

and prudence which you would exercise in the most import-
ant affairs of life, in fact all the judgment, caution and dis-
crimination you possess, and then, unless you can say from
that standpoint that the evidence fails to impress your minds
with any reasonable doubt of the defendant's guilt, you
should acquit the accused and render a verdict of not guilty."

The refusal of the court seems to have been based upon the
ground that the idea intended to be conveyed by the request
was embodied in the general charge by the following lan-
guage:

"The jury are by law made the sole and responsible judges
of the evidence; it is their duty to determine the weight and
effect of the evidence as a whole and, as necessary to such
determination, to recall and weigh the testimony of each wit-
ness and judge his or her credibility as best they can in the
light of the whole facts as disclosed by the evidence.  .  .  .
In the performance of this duty, that of scrutinizing the evi-
dence and determining its effect, you should exercise the ut-
most caution, employ all the reason, prudence, judgment and
discrimination that you possess and would summon to your
own aid in the most important affairs of life.  Having done
this, if there then remains in your mind no reasonable doubt
of defendant's guilt, you should convict him; otherwise you
should acquit him."

Waiving for the moment the question of whether the re-
quested instruction as a whole was a correct statement of the
law, we will examine the counsel's contention.  He concedes
that the language used by the trial judge was a full equiva-
lent for that requested save for the omission of the word
"care."   This court has not put its stamp of approval, nor
has any other court, upon the precise language of the re-
quested instruction, as to the use of that word, but has said
repeatedly that the idea expressed in such instruction should
be given to the jury, and if not given when requested the re-
fusal constitutes reversible error.  We are unable to see any
substantial difference between the language of the court and

that which was requested. Perhaps it would be better to use the term "care and caution." If so, that would not constitute reversible error if the correct idea was in fact, in appropriate language, given to the jury. It would seem that when a jury is told that in examining the evidence they "should exercise the utmost caution, employ all the reason, prudence, judgment and discrimination that you possess and would summon to your own aid in the most important affairs of life," there is nothing more that could be added. That seems to include the idea of utmost care and caution amplified so as to more clearly impress the idea upon the minds of the jury than would be done by the mere use of the term which counsel seems to think should have been used. In addition to the language last quoted, as will be noted, the jury were told that they should weigh the evidence of each witness "as best they can." There again, it would seem that they were told, in effect, that they should scrutinize the evidence with the utmost care and caution. On the whole we are unable to see any infirmity in the instruction along the line claimed by counsel for plaintiff in error. On the other hand it would seem that the requested instruction is not a correct statement of the law. The concluding part of the request seems to be fatally ambiguous, to say the least. This is the language to which we refer:

"Unless you can say from that standpoint that the evidence fails to impress your minds with any reasonable doubt of the defendant's guilt, you should acquit the accused and render a verdict of not guilty."

That would commonly be understood as meaning that, unless the evidence creates a reasonable doubt in the minds of the jurors as to the defendant's guilt he is entitled to an acquittal; while of course the law is that unless the evidence fails to impress the minds of the jury beyond every reasonable doubt of the defendant's guilt he is entitled to an ac-

quittal. The language of the trial court's instruction on that subject was very plain and strictly accurate. He said:

"If there then remains in your mind no reasonable doubt of the defendants guilt, you should convict him; otherwise you should acquit him."

Error is assigned on the refusal to give this instruction:

"The witness, Ole Gustad, according to his own statements, if they are true, was either an accomplice or an accessory after the fact. In such cases, courts advise the jury that, while they may convict on the uncorroborated testimony of such person, it is dangerous to do so and the evidence should be scanned with great care and caution, and so the court instructs you in this case."

It is sufficient, it seems, to justify the refusal of that instruction that it assumes that there was no evidence whatever in the case that the accused committed the offense other than that of Gustad. True, his was the only direct evidence on the question, but there was much circumstantial evidence pointing the same way, so that it was not proper to state to the jury that the state's case rested on the uncorroborated testimony of Gustad.

Further complaint is made that the court failed to instruct the jury in respect to the evidence tending to show that the character of the accused prior to the commission of the offense was inconsistent therewith. No request in writing was presented by counsel for the accused to be given by the court to the jury on the subject, so no proper foundation was laid for an exception to the failure of the court to instruct in respect to the matter. The rule is now firmly established that where the charge of the court does not cover all phases of the case counsel is bound to call its attention to the omission by an appropriate request or be precluded from making such failure available as reversible error. *U. S. Express Co. v. Jenkins,* 64 Wis. 542, 25 N. W. 549. That a mere verbal request made to the court for an instruction upon a particular subject is not an appropriate request within the meaning

of the decisions, cited, was pretty clearly held in *Karber v. Nellis,* 22 Wis. 215, where this language was used:

"If counsel desire a specific instruction on any particular point, they should draw such instruction and ask the court to give it. A mere request to charge more particularly upon some point, does not present any question for review here."

In a very late case, *Hacker v. Heiney,* 111 Wis. 313, 87 N. W. 249, opinion by Mr. Justice Dodge, sec. 2853, Stats. 1898, was construed as requiring requested instructions to be presented to the court in writing. It was said, in effect, that the section contemplates such a presentation of a request as a condition precedent to the duty of the court to consider it. The significant language of the statute which led to that construction is this:

"Each instruction asked by counsel to be given to the jury shall be given without change or modification the same as asked or refused in full."

It was held that such language plainly indicates that the legislative idea was that requests to charge must be made in writing, each proposition being stated in the exact language which it is desired the court shall use, and that the court shall rule upon the precise statement of the law thus presented. So it was held that specific error can be assigned "upon a refusal to instruct a jury" only when such refusal relates to "an instruction formally requested in writing."

After verdict a motion was made for a new trial upon the grounds heretofore discussed, and, among others, that Charles Vick, one of the trial jurors, contrary to his statement under oath upon his examination on the *voir dire,* prior to his having been called as a juror having formed and expressed an opinion that the accused was guilty. In support of such motion Richard Townsend testified that he was the proprietor of a barber shop in Neillsville where the cause was tried; that Charles Vick, the juror, during the trial of Gustad and thereafter, visited his shop on two or more occa-

sions and there conversed as to both Gustad and *Cupps* and whether they were guilty or innocent; that on the first visit the trial of Gustad was about to be concluded; that Vick then said in conversation with, or in the immediate presence of, one Jackson, one of Townsend's employees, and in the hearing of Townsend, that he thought both Gustad and *Cupps* were guilty; that if he was on the jury he would so find.    The witness said he was not then acquainted with Vick; that there were several persons in the shop, all the chairs being occupied; that during the trial of both *Cupps* and Gustad conversation in the shop was general in regard to the cases; that Vick visited the shop some days after the Gustad trial was concluded and when that of *Cupps* was about to commence, when he expressed the opinion that he would not be on the case because he heard the Gustad trial; that he was drawn for that trial and stricken off; that after the verdict was rendered against *Cupps* Vick again visited the shop, when the witness heard him say that he served as one of the jurors thereon; that he told the attorneys when he was called that he heard the Gustad trial and expected they would strike him off but that they did not.    The witness said, further, that on all the occasions mentioned he merely overheard the statements to which he testified; that he did not himself have any conversation with the juror.    Jackson, being sworn as a witness, testified that on the first occasion he remembered of Vick visiting the shop, all he said about the Gustad case was that he had been excused therefrom. Jackson further said that he did not remember of hearing Vick at any time make the statements testified to by Townsend; that on the occasion of Vick's visiting the shop just before the *Cupps* trial he merely said he did not think he would be drawn, as he heard the evidence in the Gustad trial; that Vick visited the shop after the *Cupps* trial, but that he could not recall anything the juror then said in respect thereto.    George L. Jaques testified to having heard Vick say after

the *Cupps* trial that he stated on his *voir dire* that he heard
a portion of the testimony on the Gustad trial, or formed
some opinion, or something of that sort, and was surprised
that they left him on the jury. Robert J. Glass testified
that just after Vick had been struck off the Gustad jury he
heard the latter say in the barber shop that he was glad of
having been so struck off and that it was his opinion that
both Gustad and *Cupps* should be punished. Vick testified
that he did state in Townsend's shop that he had been struck
off the Gustad jury, or that he heard part of the trial of
Gustad; that he did not state prior to *Cupps'* trial in such
shop or any where else, to any one, that Gustad and *Cupps*
were both guilty or that *Cupps* was guilty; that he did not
hear the testimony in the Gustad Case; that he was excused
after the jury was impaneled, and went home, coming back
about as such trial was concluded; that he heard the argu-
ments of counsel and so stated on his *voir dire* when called
in the *Cupps Case;* that he stated on one occasion that, who-
ever the guilty party was who killed the O'Dell woman, he
should be punished, not stating whether in his opinion *Cupps*
and Gustad or either of them did the deed. Upon that tes-
timony the court held that Vick did not make any false state-
ments when examined upon his *voir dire* in the *Cupps Case,*
and had not prior thereto formed or expressed any opinion
as to *Cupps'* guilt or innocence. There was evidence both
ways on the question. That presented for determination a
question of fact. The decision reached has all the conclusive-
ness upon this appeal of the determination of a trial court
upon any issue of fact. That is, it cannot be disturbed unless
it satisfactorily appears from the record to be against the
clear preponderance of the evidence. *Carthaus v. State,* 78
Wis. 560, 47 N. W. 629. Evidence to impeach a verdict by
attacking the fairness of a jury in such circumstances as that
attempted in this case, to be effective, should be very clear
and satisfactory. The court should not act upon it favorably

to impeaching the verdict in the face of an unequivocal de-
nial of the juror, in the absence of the most clear and satis-
factory evidence of the falsity of such denial. After verdict,
especially in a capital case, the interests at stake, tempting
an attack upon some particular juror, are so great, the ease
with which such statements as those claimed here, made in
casual conversations, may be varied honestly or otherwise,
and thus a *prima facie* case be presented where none exists
in fact, that all such evidence should be scrutinized with the
greatest caution and care before passing judgment favorably
thereto. The evidence against juror Vick was substantially
all as to mere casual conversations. His unequivocal denial
was opposed only by the evidence of one witness. There was
definite evidence of two distinct statements made by him, one
heard by Townsend upon the last day of the Gustad trial,
and one by Glass upon the day the jury therefor was im-
paneled. It seems quite clear that the occasion testified to
by Townsend was not the one testified to by Glass. So in
each instance there was the evidence of the juror against that
of one person, such opposing person not being definitely cor-
roborated by any circumstance whatever, while the juror had
in his favor a strong presumption of innocence. The wit-
ness Jackson, who, according to Townsend, would be most
likely to have remembered the statement made by Vick which
Townsend testified to, if it were in fact made, stated that he
could not recall having heard the latter make any such state-
ment. The testimony that Vick said to Jaques and others
that he heard the evidence upon the Gustad trial is quite
effectually overborne by the circumstance that he was not
present during the taking of the evidence. He denied hav-
ing stated, understandingly, that he heard the evidence but
admitted being present during the argument to the jury. The
effect of Jaques testimony is that the juror claimed that the
statements made in his presence or to him in respect to such
juror's knowledge of the Gustad trial, were substantially the

same as he made upon the *voir dire* when called in the *Cupps
Case,* and there does not appear to be any definite evidence
that such is not the case. It hardly needs argument to dem-
onstrate that the finding of the trial court against the charge
of unfairness as to juror Vick, upon such evidence cannot
be disturbed. There is at least clear warrant for saying that
such finding is not against the clear preponderance of the
evidence. It seems that if such evidence would warrant
granting a new trial because of the unfairness of a juror,
there would be very little stability to verdicts in cases of
great public and private interest, such as this.

Further complaint was made on the motion for a new trial,
because one Cornelius, the register of deeds of Clark county,
while on the way to his office passed the jurors on one occa-
sion during the trial, in front of the courthouse, and that as
he did so he said good morning and handed the officer in
charge of them $1.25 or $1.50, with a request that he should
expend the same for cigars for their use, and that the officer
acted accordingly. There was evidence that Cornelius was
in no way interested in the case, and that the act was purely
one of goodfellowship which had no baneful influence what-
ever upon the jury. True, it would be better if no such at-
tentions to a jury, especially while engaged in such an im-
portant trial as this, should occur. However innocent the
person giving them may be, they are highly improper, and
the conduct of the officer consenting thereto or participating
therein is highly reprehensible. However, the presumption
of prejudice from the transgression in the circumstances of
this case was such as to yield quite readily to rebutting proof;
and it was most thoroughly rebutted, as it seems to us. The
officer in charge of the jury frankly related all the circum-
stances connected with the transaction, showing that Cor-
nelius made no effort to talk with the jury; that his conver-
sation was wholly with such officer except that he said good
morning to the jurors; that his handing the money to the

officer to buy cigars for the jurors was a mere friendly act, such as he was accustomed to do, and that such officer asked the trial judge whether he should give the cigars to the jury or not. The circumstance as explained was of trifling character,—certainly not one that would warrant disturbing the verdict of a jury under the rules laid down in the opinions of this court. *Hempton v. State,* 111 Wis. 127, 86 N. W. 596. The conduct of Cornelius and the officer presents none of the elements of gross misconduct sometimes severely criticized by appellate courts and sometimes held fatal to the verdict.

We have now considered one by one all the propositions presented by counsel for plaintiff in error, and endeavored to respond fully to his appeal for a careful, critical and thorough examination of the case to the end that if the accused has not had a fair trial he might be relieved from the judgment rendered against him. In our judgment there is no error in the record. The trial seems to have been exceptionally clean and fair from beginning to end, and the result must stand so far as judicial relief is concerned.

*By the Court.*—The judgment is affirmed.

The plaintiff in error moved for a rehearing.
The following opinion was filed February 23, 1904:

MARSHALL, J. A motion for reargument has received careful attention. Because of the importance of the case, and the evident confidence of counsel that a further consideration of one question, not very fully treated in the former opinion, should be had, we have examined the matter with care, and will depart from the usual custom of not filing a second opinion upon coming to the conclusion that the judgment entered should stand.

The question above referred to is this: Does the destruction of human life by an act of another naturally and ac-

cording to the ordinary course of things calculated to effect
that result, in the absence of any explanatory circumstances
to the contrary, raise a presumption of fact or of law that
the destroyer intendeded such result and is guilty of murder
in the first degree? Respecting counsel's argument in sup-
port of the negative, in the former opinion we said:

· "Counsel for plaintiff in error freely admits that the law
is as thus stated as applied to murder at the common law,
but insists that the law is different under our statutory sys-
tem. · No very good reason is advanced to support that idea,
and no authority in support thereof is cited."

Counsel takes issue with that because he cited, before,
*Stokes v. People,* 53 N. Y. 164, 179. This seems to be a fair,
if not a sufficient answer thereto: The quoted language was
not used without qualification or explanation. It was said
that counsel produced no very good reason or authority for
his position, since our statutes, as construed, make every in-
tentional destruction of human life, not excusable or justi-
fiable, murder in the first degree; and the departure from
the common-law rule, as to the presumption arising from an
unexplained homicide, where such departure prevails, grows
out of statutory differences rendering such intentional killing
a homicidal offense, either in the first or some lower degree
according to the facts. *Stokes v. People* was not deemed im-
portant, since mere actual intent to kill was not, under the
New York statutes when Stokes' offense was committed, in
any circumstances, necessarily, murder in the first degree.
We referred to one of many cases that might have been cited,
showing that the rule contended for found a place in the
books by reason of features of many statutes not in ours.
Here, actual intent to slay satisfies the premeditated design
of the statute (*Hogan v. State,* 36 Wis. 226; *Perugi v. State,*
104 Wis. 230, 80 N. W. 593), and is inconsistent with any
other homicidal offense. That has been so distinctly and
firmly entrenched in our jurisprudence that it was supposed

authorities to the contrary elsewhere, under different statutes, might properly be referred to as not in point. Counsel now cites quite a number of adjudications, not taking note of our suggestion that decisions under statutes radically different from ours cannot be followed, further than to say that some of such authorities are based on statutes like ours. Though decisions of the character cited exist in abundance, we venture to say that without any important exception the variance therein, from the doctrine that the unexplained taking of human life by means ordinarily and naturally calculated to produce that result implies a homicide committed with actual intent, satisfying the element of premeditated design of our statute, is attributable, reasonably or necessarily—the latter in most cases—to plain statutory differences. To refer in detail to the decisions at hand illustrating that, in connection with the statutes involved, would take much time and space. We will refer to a goodly number of them, however, pointing out the significant features of such statutes.

The first statutory system for punishing criminal homicide in this country was adopted in Pennsylvania in 1794. 1 Pepper & Lewis' Dig. of Laws, 1274. "Willful, deliberate and premeditated murder, and murder committed in the perpetration or attempt to perpetrate" certain other specified offenses, were made murder in the first degree, and all other, murder in the second degree. It was early construed as rendering mere intent to kill not inconsistent with murder in the second degree, and as requiring, in order to raise the grade necessarily to the higher degree, the independent elements of deliberation and premeditation upon the execution of the intent, the element of intent being referrable only to willfulness. *Keenan v. Comm.* 44 Pa. St. 55; *Small v. Comm.* 91 Pa. St. 304; *Comm. v. Drum,* 58 Pa. St. 9. The latter case will be found cited very often. It is to this effect: Mere felonious intent to kill is not sufficient to constitute

murder in the first degree, not having the element of fully formed design, involving premeditation and deliberation. It may be murder in the second degree, but to raise it to that phase of murder in the first degree requiring the element of actual intent to kill there must be willfulness, signifying intent, and the other elements in addition; hence the mere unexplained destruction of human life raises only the presumption of murder in the second degree. That gives full effect to the universal rule that every sane person is presumed to intend the natural and probable results of his acts. Such effect being death, the intent to produce death is presumed, but not that the act producing it was characterized by the other elements mentioned. Virginia, West Virginia, Tennessee, Missouri, Michigan, Nevada, Colorado, Nebraska, California, North Carolina, Texas, Iowa, Washington, North Dakota, Massachusetts, Montana, Maine, New Jersey, New Hampshire, and many other states, including by far the greater part of the states of this Union, have similar statutes. They are all based on the Pennsylvania model. Many decisions under them, and text-book authorities, might be referred to supporting the idea that the presumption under consideration does not necessarily go higher than murder in the second degree; but a careful examination of the cases will show a uniform distinction made therein between mere intent to kill before the fatal act, and that full intent required by the statute, the term "deliberate" being used in addition to the term "premeditated design." The usual language is: "When perpetrated from a deliberate and premeditated design," etc. For examples we refer to *State v. Fuller,* 114 N. C. 885, 19 S. E. 797; *State v. Carver,* 22 Oreg. 602, 30 Pac. 315; *McCoy v. State,* 25 Tex. 33; *Floyd v. State,* 59 Tenn. 342; *People v. Wolf,* 95 Mich. 625, 55 N. W. 357; *Stokes v. People,* 53 N. Y. 164; *McCue v. Comm.* 78 Pa. St. 185; *Comm. v. Drum,* 58 Pa. St. 9; *Dukes v. State,* 14 Fla. 499; *State v. Payne,* 10 Wash. 545, 39 Pac.

157·; *State v. Foster,* 61 Mo. 549; *State v. Hobbs,* 37 W. Va. 812, 17 S. E. 380; *State v. McCormick,* 27 Iowa, 402; *Schlencker v. State,* 9 Neb. 300, 2 N. W. 710; *Simpson v. State,* 56 Ark. 8, 19 S. W. 99; *Williams v. State,* 83 Ala. 16, 3 South. 616; *Hill v. Comm.* 2 Grat. (Va.) 594; *Howell v. Comm.* 26 Grat. 995. The law as declared therein is laid down without proper or any notice of exceptions in the following works: Desty, Cr. Law, § 129*g;* 21 Am. & Eng. Ency. of Law (2d ed.) 163; 2 Thompson, Trials, § 2208; 1 Wharton, Cr. Law, § 392; 1 McClain, Cr. Law, § 355. The following examples of what is in effect said in such decisions will clearly indicate the significance of the statutory feature we have referred to.

Where an intention to kill exists, it is willful; whilst intention is of the essence of the offense, something more is required for murder in the first degree. There must be circumstances warranting the jury in finding deliberation and premeditation. The unexplained destruction of human life raises the presumption of intent to kill, but that only points to murder in the second degree, because the other constituent elements of willful killing essential to murder in the first degree, deliberation and premeditation, do not arise by presumption. *State v. Foster, supra* (Missouri). The similarity of this to the views expressed in *Comm. v. Drum* will be noted.

Mere unjustifiable, inexcusable intention to kill is not enough to constitute felonious homicide above murder in the second degree. The higher degree requires premeditated intent, which does not arise from unexplained destruction of human life. *Simpson v. State, supra* (Arkansas). The cases are all to the same general effect.

A statutory system was adopted in New York in 1829. Felonious homicides were by it divided into murder and manslaughter. Murder was divided into three distinct classes as to circumstances, but they were all subclasses of the one

offense of murder, no degrees being established. This state antedated New York in that regard by thirteen years. The original New York statute is as follows:

"The killing of a human being, without authority of law, . . . in any . . . manner, unless . . . manslaughter or excusable or justifiable homicide, shall be murder in the following cases:

"1. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being:

"2. When perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual:

"3. When perpetrated without any design to effect death, by a person engaged in the commission of any felony." 2 R. S. N. Y. 1829 (1st ed.), p. 656, pt. 4, c. 1, tit. 1, §§ 4, 5.

By ch. 197, Laws of N. Y. 1862, the offense of murder was divided into three degrees, corresponding to the existing classes of murder. By ch. 644, Laws of 1873, a further change was made, the statute assuming this form as to homicide in the first degree:

"When perpetrated from a deliberate and premeditated design to effect the death of the person killed, or of any human being; or when perpetrated by an act imminently dangerous to others, evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; or when perpetrated without any design to effect death by a person engaged in the commission of any felony."

And as to the second degree it took this form:

"Such killing, unless it be murder in the first degree, or manslaughter, or excusable or justifiable homicide . . . shall be murder in the second degree when perpetrated intentionally, but without deliberation and premeditation." 3 R. S. N. Y. 1875 (6th ed.), p. 928, pt. 4, c. 1, tit. 1, § 5.

As first adopted the system was said to make all felonious homicide, characterized by intent to take human life, mur-

der, but as neither making such intent essential to nor ex-
cluding it from the second phase of the offense.   *People v.
Austin,* 1 Parker, Cr. R. 166; *People v. Clark,* 7 N. Y. 385;
particularly *Darry v. People,* 10 N. Y. 120.   After the first
change, *Stokes v. People,* 53 N. Y. 164, was decided, and,
consistent with the rule established as to murder in the sec-
ond degree, the language was used upon which counsel relies.
The court leaned toward the holdings under the Pennsyl-
vania statute.   After the second change adding the element
of deliberation to that of premeditated design in murder in
the first degree, and the element of intent to kill, but with-
out premeditation and deliberation, to murder in the second
degree, the doctrine, that circumstances raising the presump-
tion of intent to kill satisfy only the calls for the essentials
of the latter degree, necessarily prevailed.   *People v. Beck-
with,* 103 N. Y. 360, 8 N. E. 662; *People v. Hawkins,* 109
N. Y. 408, 17 N. E. 371; *People v. Conroy,* 97 N. Y. 62.

The state of Florida adopted the New York system as it
existed after the change of 1862, with its judicial construc-
tion of the language of murder in the second degree.   That
explains why *Dukes v. State,* 14 Fla. 499, now cited by coun-
sel, does not have the force counsel claims for it.

The Minnesota system, as it existed up to its revision of
1878, was copied from ours, with some changes which we
will mention.   Actual intent to kill, coupled with heat of
passion, was made an element in one degree of manslaughter.
The language as to murder in the first degree was a verbatim
copy of ours.   That of the second degree differed from ours
in this: For the words here, "dangerous to others   .   .   .
although without any premeditated design to effect the
death of any particular individual" (sec. 2, R. S. 1849,
p. 682, ch. 133; R. S. 1858, p. 928, ch. 164), were these
words: "Dangerous to one or more persons   .   .   .   without
any design to effect death."   That was changed before the
Minnesota revision of 1891 by making the second degree the

third and making killing with design to effect the death of
the person killed or of any other, but without deliberation
and premeditation, murder in the second degree.   Cr. Code
Minn. 1866 (Revision 1866, p. 597, ch. 94, § 2); 2 Gen.
Stats. Minn. 1891, p. 488.   Before the change referred to
the court said, respecting the presumption under considera-
tion:

"It is presumed that every sane person intends the ordi-
nary and natural consequences of his own deliberate act, and
that every voluntary act springs from deliberate volition, and
not blind passion; and as every act unlawful in itself is pre-
sumed to have been wrongfully intended till the contrary ap-
pears, it follows that such a killing, unaccompanied by any
circumstances of extenuation or explanation, necessarily
raises the presumption that it was intentionally and malici-
ously done; and unless it appears that such intention was
formed and executed under the influence of 'a heat of pas-
sion produced by a sudden provocation, or in sudden combat,'
it is equivalent in import and meaning to a premeditated de-
sign, as that phrase is used in the statutes." *State v. Lau-
tenschlager,* 22 Minn. 514.

After the change that was adhered to because the essentials
of murder in the first degree were as before, the views of the
court being expressed thus:

"The offense may be found to be of this grade (murder in
the first degree) from the mere fact and circumstances of the
killing; and where there are no circumstances to prevent or
rebut the presumption the law will presume that the unlaw-
ful act was intentional and malicious, and was prompted and
determined on by the ordinary and natural operations of the
mind." *State v. Brown,* 41 Minn. 319, 43 N. W. 69.

That was affirmed in *State v. Lentz,* 45 Minn. 177, 47
N. W. 720, in this language:

"Murder in the first degree may be proved by the mere
fact of an intentional killing.   .   .   .   The evidence con-
tained no suggestion of any provocation or mitigating cir-
cumstances, or that the killing was accidental, the testimony

of the defendant himself excluding any such hypotheses. The killing, if committed by defendant, was murder in the first degree."

This court rejected the New York construction of the language of our murder in the second degree in *Darry v. People,* 10 N. Y. 120, holding that the legislative plan here was to make every inexcusable, unjustifiable homicide, intentionally effected, murder in the first degree, to make the element of intent to kill an essential of that and to exclude it from all other degrees of felonious homicide; and to that end that the terms "design" and "premeditated design" were used synonymously and as meaning only actual intent. *Hogan v. State,* 36 Wis. 226. The court was free to and did place its own construction on the statute, the language thereof not having received construction in New York before its adoption here, further than to the effect that every homicidal offense characterized by intent to kill is murder, not manslaughter, which was adopted. That is, as seems plain, in harmony with constructions of statutes elsewhere, except in the instance referred to, and such as are explained by radical difference in language. At this time there is no conflict between this court and that of New York, because the statute there has been changed, as we have seen, to make the literal sense thereof conform to the judicial construction; and our statute has been likewise changed. The revisers of 1878 changed the language of murder in the second degree, "without any premeditated design to effect the death of the person killed or of any particular individual," to "without any premeditated design to effect the death of the person killed or of any human being." That change was made to make the statute conform in literal sense to *Hogan v. State,* 36 Wis. 226. See Revisers' Notes, 1878, p. 297.

From the foregoing it follows that all the decisions and remarks of text writers to the general effect that the presumption under discussion points only to murder in the sec-

ond degree, instead of supporting the idea that it should be so restricted under our statutes, conclusively indicates to the contrary, since the element of intent to kill here is consistent only with murder in the first degree, and such element being present no additional element of deliberation is necessary, all the deliberation essential being involved in the actual formation of the purpose to kill before the perpetration of the fatal act. The formed design or intent of our premeditated design need not exist any appreciable time or time sufficient for the intervention of any independent element between it and the fatal act, it being sufficient if it actually precedes such act. Intent to kill means just what the ordinary signification of the words suggest. Whether it be described by the words "actual intent," "design," or "premeditated design," makes no difference. When we leave entirely out of view those subtleties often indulged in in discoursing on the meaning of "premeditated design," or "deliberate and premeditated design," and give to the words only the meaning ordinarily attributed to them in the common use thereof, a person who effects the death of another by design does so intentionally and the design or intent is understood to necessarily precede the act by which the purpose is accomplished. In other words, the intent is understood to be premeditated, or thought of, because without mental action the purpose could not be formed. So when it is said that the slayer intentionally caused the death of his victim, it is at the same time said that he caused it by design and by premeditated design. That the word "premeditated," as used in our statutes on the subject of felonious homicide, has no other significance than that the design must precede the homicidal act, is indicated from the evident purpose of the statute makers to give the same meaning to the term "premeditated design," where used inclusively in murder in the first degree, as to "design" where that word alone is used exclusively in murder in the third degree and manslaughter in the first,

second and third degrees. We should say in passing that this is only repeating the reasoning found in *Hogan v. State,* to render as clear as we can the reason why circumstances, from which, unexplained, arises the presumption of intent to destroy human life, may, and in case they are such as naturally and in the ordinary course of things would be expected to produce that result, necessarily must, point to the offense of murder in the first degree, and that only.

No uncertainty as to the matter here discussed would probably at any time have existed here after the decision in *Hogan v. State,* had the reasoning there been followed without interruption. It was somewhat lost sight of in *Clifford v. State,* 58 Wis. 477, 17 N. W. 304, language being there used indicating that actual intent to kill is one thing, and premeditated design to kill another. The reasoning is along the lines of decisions under statutes having the several elements of willfulness, deliberation and premeditation. It went beyond many of them in that it indicated that the element of lying in wait, of deliberation upon the execution of the intent, is essential. Whereas, in *Hogan v. State* it was said:

"The premeditated design of our murder in the first degree is simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent."

In the *Clifford Case* it was said:

"Intentional and premeditated design are very far apart."

The general treatment of the subject in the opinion led to the mistake in *Terrill v. State,* 95 Wis. 276, 70 N. W. 356, and *Sullivan v. State,* 100 Wis. 283, 75 N. W. 956. In the former the reasoning of Mr. Justice Orton was adopted and that of Ryan, C. J., in the *Hogan Case,* was criticised. The error became clearly apparent when *Perugi v. State,* 104 Wis. 230, 80 N. W. 593, was decided, the rule of the *Hogan Case* being re-established. That was reviewed and approved

in *Miller v. State,* 106 Wis. 156, 81 N. W. 1020. Thus, the idea that the premeditated design of the statute includes necessarily any element of deliberating upon the execution of the intent was emphatically repudiated.

Had the text writers comprehended better the exceptions to statutes in general, this language in 1 McClain, Cr. Law, § 359, would not have been written without noting and giving significance to such exceptions:

' "It has been said in some cases that an intentional killing, the intent to kill being shown by the use of a deadly weapon, will, in the absence of any evidence of justification, excuse, or mitigation, be murder in the first degree. Such a presumption is denied, however, in other cases, and it is said that killing with a deadly weapon is not enough alone to show deliberation and premeditation. . . . However, according to the great weight of authority such presumption does not arise from proof of intentional killing alone, and from such evidence, without more, the jury would not be justified in convicting of the first degree."

The conflict of authority referred to appears only when one does not appreciate the fact that statutory differences correspond to differences in the adjudications. Strange it seems that the author did not take up the various statutes, classify them, as may easily be done, and show how it came about that in many and most jurisdictions the presumption under discussion has been held to go only to murder in the second degree, while in a few jurisdictions, including our own and that of Minnesota, it is held to go to murder in the first degree. Bishop, in his new Criminal Procedure, vol. 2, § 602, recognizes the wide difference in the statutes to which we have referred, this language being used:

"If the deadly weapon is used in a way to take life, the not-conclusive presumption is that the party meant this result; so that the first degree of the offense is, under most of our statutes, shown. But a mere killing with such weapon, with nothing more, is not murder in the first degree. And where the statute requires a more distinct premeditation, or

more intense malice, the verdict can be only for the second degree. But it should be borne in mind that the circumstances and statutes differ, and that the jury should pass on the question."

No case is referred to by the author, except those under statutes differing from ours, requiring something more in murder in the first degree than mere intent to kill, yet he concludes that a presumption of fact arising from the unexplained use of a deadly weapon in a way ordinarily calculated to produce death, and which does produce it, arises, of such strength to warrant a jury, if they see fit, in finding murder in the first degree. That is really as far as it was necessary to go in this case, and as far as the court in fact went; though it seems that, since under our statute actual intent to kill, executed, without any other element, there being no circumstance reducing the offense below that of the highest, constitutes murder in the first degree, the presumption of law, that every person intends the natural and ordinary consequences of his voluntary acts, must, when the act causes the death of a human being, include the presumption that the perpetrator thereof intended that result and is guilty of murder in the first degree, casting upon him the burden of producing evidence to at least involve the truth of the matter in reasonable doubt. This court said in the *Clifford Case,* where a conviction was had of murder in the first degree, that the expression in the trial court's instructions, "It is presumed that a reasonable person intends all the natural, probable and usual consequences of his act," is strictly correct in all moral action or human affairs, and is an axiom of the law; and that the expression, "If a reasonable man uses a deadly weapon and life is taken, he is presumed to intend the natural consequences of his act and would be guilty of murder,"—"is but an application of the principle of homicide with a dangerous weapon likely to kill." "If a weapon likely to kill, and which did kill, was used, the intent

is presumed that such a natural and reasonable consequence would follow the assault, and nothing less." True, in connection with that, language was used of the character heretofore referred to, but, as we have seen, so far as it suggested that there may be an intent, a mental purpose to take human life, in some other homicidal offense than the first, such idea has been repudiated. What was said in respect to the presumption under discussion, therefore, stands as an authoritative declaration to the same effect as that contained in the opinion in this case, which counsel thinks is prejudicially wrong to plaintiff in error.

The result of a full response to counsel's appeal for a reconsideration of the question above discussed is that the conclusion in respect thereto, embodied in the judgment rendered, is correct. Therefore the motion for a rehearing must be denied.

*By the Court.*—So ordered.